23 A.3d 867

Donna SILVER

v.

STATE of Maryland.

Hilton Silver

v.

State of Maryland.

Nos. 98, 99 Sept. Term, 2010.

Court of Appeals of Maryland.

June 20, 2011.

Reconsideration Denied Aug. 11, 2011.

416

Deborah S. Richardson, Asst. Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for petitioner in No. 98, Sept. Term, 2010.

Ryan R. Dietrich, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent in Nos. 98 and 99, Sept. Term, 2010.

Russell P. Butler, Esq., Bridgette Harwood, Esq., Maryland Crime Victims' Resource Center, Inc., Upper Marlboro, MD,

for Amicus Curiae brief of Maryland Crime Victims' Resource Center, Inc. in Nos. 98 and 99, Sept. Term, 2010.

Kimberly A. Kline, Baltimore, MD (Jay Fred Cohen, Baltimore, MD), on brief, for petitioner in No. 99, Sept. Term, 2010.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

ADKINS, J.

In this animal cruelty case, we must determine whether, under the rule in *Walczak v. State,* 302 Md. 422, 488 A.2d 949 (1985), which prevents a trial court from ordering restitution relating to dropped charges, a defendant convicted of cruelty toward one horse may be required to pay restitution for other horses he allegedly neglected. The Petitioners, Donna and Hilton Silver, owned three horses who were found by police in terrible health. One of the horses had to be euthanized on the property, and the other two were sent to a rescue farm for rehabilitation. Police charged the Silvers with three counts of animal cruelty. The Silvers entered plea bargains in District Court sitting in Baltimore County, pursuant to which they each pleaded guilty to one count of animal cruelty, and the State did not pursue the remaining counts.

After being sentenced by the District Court, however, the Silvers appealed for a de novo trial in the Circuit Court for Baltimore County. The State did not re-file charges for the dropped counts, thus pursuing only the charge relating to the horse that died. At trial, the Circuit Court heard evidence regarding the condition of the other two horses and convicted the Silvers each of one count of animal cruelty. As a condition of probation, the Court ordered the Silvers to pay restitution to veterinarian who euthanized one horse, and to the rescue farm for the costs of caring for the surviving horses. The Silvers petitioned for a writ of certiorari from this Court, and we granted to answer the following questions: [1]

---

1. We have consolidated and rephrased the questions as appropriate. The Silvers filed separate Petitions for Writ of Certiorari, both of which

1) Did trial court err in imposing criminal restitution for offenses for which the petitioner was not convicted?

2) Where the prosecutor failed to provide discovery of a written report prepared by the State's witness, relating to the offense charged, did the trial court err in admitting testimony of that witness?

3) Did the trial court err in admitting photographs depicting alleged other offenses for which petitioner was not being prosecuted?

We shall hold that the court was not permitted to order restitution for the other horses with regard to whom the defendants were not convicted of a crime, and vacate that order. We shall hold that the Circuit Court's evidentiary decisions and sentence were otherwise valid, and thus affirm the rest of its judgments.

## FACTS AND LEGAL PROCEEDINGS

On March 20, 2009, Kerry Boller drove down Frys Lane in Randallstown, Maryland, on her way to visit a friend and former neighbor, and passed the property of Donna and Hilton Silver, the defendants in this case. Ms. Boller knew the Silvers' property well, having looked after the Silvers' horses while they were on vacation the year before. On that day, as she passed, she noticed a large white object in the yard, covered by a blue tarp. She then observed that the Silvers' white horse was missing from the horse paddock. Ms. Boller talked to her former roommate on Frys Road, and encouraged her to contact the police.

Five days later, after receiving the complaint, Joyce Barnett reported to the Silvers' property. Barnett is an experienced Animal Control officer for Baltimore County, and the owner of horses herself. As she pulled in the driveway, she saw two horses in the pasture whose ribs were visible under their skin.

---

contained a challenge to the restitution order. The evidentiary issues, listed above as questions two and three, were presented only in Hilton Silver's petition.

As she walked through the yard, she then saw what she thought to be a dead horse lying under a blue tarp.

Yet, as she approached the horse, it snickered at her, as a dog would wag its tail. The horse—Calypso—attempted to lift her head off the ground, but other than that was unable to move. Calypso's ribs were showing, and her back and hips were covered with burrs. The ground around Calypso's head and feet was dug out, as the horse had been kicking and rocking back and forth attempting to get up. Behind the horse, there was a large pile of manure. It was apparent that she had been lying there for days.

Barnett went to the house and knocked on the door. Donna Silver came to a window. After being questioned, Mrs. Silver told Barnett that the horse had fallen down a few days earlier, and that they had been unable to get the horse up, and could not afford a veterinarian.

Soon after, Hilton Silver returned. He was visibly upset that Barnett had blocked his driveway, and refused to answer questions about Calypso. Barnett thus moved her vehicle onto the grass, and attempted again to discuss the horse with Mr. Silver. He said that after the horse had fallen down, they had tried to lift him up, even getting a neighbor to try and lift him with his tractor. After these attempts failed, Mr. Silver covered Calypso with a blue tarp, and "came out every day to see if it was still alive."

Barnett told the Silvers that the horse needed to be euthanized, immediately. The Silvers continued to refuse a veterinarian, and asked Barnett if she could just shoot the horse to save the veterinarian's fee. Barnett requested a police dispatch, at which time Officer Heather Carpen reported to the Silvers' property.

When Carpen arrived, Mr. Silver was still upset. He told both officers that it was "none of [their] business about the horses[,]" and that he "wanted [them] off of his property." Carpen reiterated that the horse needed to be euthanized, and Mr. Silver asked Carpen to just shoot her. After talking with her supervisors, Carpen told Mr. Silver that she was not

allowed to shoot the horse, but that he, as the owner of the horse, could. Silver called some of his neighbors, asking to borrow a gun, but none of his neighbors wanted to get involved.

Carpen and Barnett then attempted to contact veterinarians, and ask if they would accept monthly payments in lieu of a fee up front, so that the Silvers could afford to have the horse euthanized, while Barnett's supervisor sought approval to have the County pay for a euthanization. Eventually, Barnett got in touch with a veterinarian's office in Hampstead, who agreed to accept monthly payments, and sent Dr. Klebe, an associate veterinarian, to the site. Dr. Klebe arrived shortly thereafter.

The veterinarian's diagnosis was grim:

[Calypso's] body was covered in burrs. She was obviously severely emaciated....

[S]he had a rapid eye movement that I could see where the pupil flickers back and forth in a horizontal fashion, and that's called nystagmus, and that indicates some sort of neurological compromise. She had crusts around her eyes ... [which] usually indicates significant dehydration, and also soft trauma.

\* \* \*

[I]t was clear from the dull color of her gums she was in sever and prolonged shock.

She also had sores on body from being recumbent for so long and trying to drag herself around on the ground.

\* \* \*

[S]he was in shock which causes kind of global pain in the body.

She was having difficulty breathing. She was probably in kidney failure, which is also very, very painful to the point where she was having neurological deficit, so her mensuration, her appreciation of the world, was substantially impaired.

Dr. Klebe observed that Calypso had been in that position for an extended period of time:

> There was a large quantity of feces around the mare's hind quarters.... She had obviously been there for a considerable period of time to defecate in that quantity. There were also marks on the ground where the mare had attempted to drag herself around a little bit. You could see the impression her body left as she kind of slowly wiggled along the ground.

* * *

> [I]t was obvious that her condition hadn't come about in one or two days, or even one or two weeks, probably even one or two months. It had to have been really prolonged neglect [and] prolonged starvation[.]

Dr. Klebe concluded that Calypso was "too far gone to try and rehabilitate[,]" and "was suffering from a point where it wasn't human to try to prolong her condition[.]"

Despite Dr. Klebe's agreement to accept monthly payments of $10 for the euthanization fee, the Silvers refused, wanting instead to wait for representatives from the Animal Welfare Society of Howard County, who apparently had agreed to perform the euthanization for free. The Society, however, had never performed a euthanization before, and Barnett and Dr. Klebe did not feel comfortable leaving the task to them. Instead, Dr. Klebe decided to euthanize Calypso for free.

Because of Calypso's medical condition, euthanizing her was difficult, as described by Dr. Klebe at trial:

> I had to use a fair amount [of barbiturate]. For an average, actually a thousand pound horse, we use about a hundred cc dose. In her case I had to use more. I think it was closer to 150 cc's .... [b]ecause she was in such poor circulatory condition. She was in such complete shock. We can put a hundred cc's in, but if her heart isn't pumping the blood properly to distribute this drug to the tissues, it is not going to be effective, so we had to use a massive overdose on her in order to be able to accomplish what the drug should do in a healthy horse.

A few days after Calypso was euthanized, Barnett returned to the Silvers' property to discuss the other two horses on the property.[2] Those horses, a Chesnut and a Bay Arabian, exhibited similar, though not as extreme, symptoms of malnourishment and neglect. The Silvers refused to turn the horses over to Animal Control. Instead, the State obtained a warrant to confiscate the horses, and transported the two horses to Days End Farm in Howard County.

In May 2009, the State charged Hilton and Donna Silver each with three counts of animal cruelty, pursuant to Maryland Code (2002, 2007 Cum.Supp.), Section 10–604(a)(5) of the Criminal Law Article ("CL").[3] The initial trial proceedings were held in the District Court on August 4, 2009. Before that hearing, the State reached plea deals with the Silvers; the Silvers would enter Alford guilty pleas[4] to one count of animal cruelty (the one regarding Calypso), and the State would not pursue the charges regarding the other two horses. At the hearing, pursuant to the deal, both Donna and Hilton Silver pled guilty to one count of animal cruelty, and the other counts were "nolle prossed" by the State's Attorney.[5] The District Court judge then heard a stipulated state-

---

2. The Circuit Court judge limited testimony on this topic at trial at the request of the Silvers' counsel. Additional information regarding their custody was revealed at the sentencing hearing.

3. Section 10–604(a)(5)(ii) of the Criminal Law Article ("CL") provides: "(a) *Prohibited.*—A person may not: * * * (5) if the person has charge or custody of an animal, as owner or otherwise, unnecessarily fail to provide the animal with nutritious food in sufficient quantity, necessary veterinary care, proper drink, air, space, shelter, or protection from the weather."

4. Drawing its name from *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), such a plea is "a guilty plea containing a protestation of innocence." *Marshall v. State*, 346 Md. 186, 189 n. 2, 695 A.2d 184, 185 n. 2 (1997), *citing Pennington v. State*, 308 Md. 727, 728 n. 1, 521 A.2d 1216, 1216 n. 1 (1987).

5. "A nolle prosequi, or nol pros, is an action taken by the State to dismiss pending charges when it determines that it does not intend to prosecute the defendant under a particular indictment." *State v. Huntley*, 411 Md. 288, 291 n. 4, 983 A.2d 160, 162 n. 4 (2009) (citing *Ward v.*

ment of facts, and sentenced the Silvers to serve six days of imprisonment over the course of three weekends.[6] The Silvers filed a timely appeal for a de novo trial to the Circuit Court of Baltimore County.[7] After the District Court hearing, Mrs. Silver "signed over" the horses to Animal Control.[8]

The Circuit Court held a de novo bench trial on April 27, 2010.[9] At trial, counsel for the Silvers[10] attempted to limit any testimony regarding the horses other than Calypso, arguing that it was irrelevant because those charges had been nolle prossed. The trial judge denied those requests, allowing testimony regarding the condition of those horses, stating "I admit it for the purposes of not necessarily the prosecution of other crimes, but I believe its [relevant] to the determination with respect to the expert opinion of the officer."

The Circuit Court convicted both of the Silvers of animal cruelty. The Court then set in a hearing date, and ordered a pre-sentencing investigation, including psychological examina-

---

*State,* 290 Md. 76, 83, 427 A.2d 1008, 1012 (1981)). "[A] nolle prosequi discharges the defendant on [that particular] charging document or count which was nolle prossed, ... [but] does not preclude a prosecution for the same offense under a different charging document or different count." *Ward,* 290 Md. at 84, 427 A.2d at 1012–13.

6. The District Court further ordered the Silvers to pay $275 restitution to Dr. Klebe for euthanizing Calypso, and $9,950 to Baltimore County for rehabilitating the other two horses. They were each fined $1,000, with the entire amount suspended, and sentenced to one year of probation.

7. In "a criminal case in which sentence has been imposed or suspended following a plea of nolo contendere or guilty, ... an appeal [of a district court judgment to the circuit court] shall be tried de novo." Md.Code (1974, 2006 Repl.Vol.), § 12–401(f) of the Courts and Judicial Proceedings Article ("CJP"); *see also* Maryland Rule 7–102(a), *et seq.* (establishing procedure for appeal).

8. At that point, Mr. Silver denied any ownership of the horses, so he declined to formally release them.

9. The defendants both waived their rights to a jury trial.

10. The Silvers were represented separately in the Circuit Court.

tions.[11] The Circuit Court held the sentencing hearing on August 2, 2010. Relevant here, counsel for each of the Silvers objected to a restitution order regarding the two surviving horses. Counsel for Hilton Silver stated:

> [T]he other two horses were not the subject of this proceeding .... [and restitution] may only be ordered with qualifications as [an] indirect sentence for a criminal delinquent act. The only crime that this Court had before it was the neglect of the one specific horse. .... I think that any restitution that the Court orders has to be limited to the one horse[.]

Counsel for Donna Silver similarly stated that "any request for restitution[ ] as it relates to the other two horses is improper[.]" The Circuit Court disagreed, stating "we're at sentenc[ing] now, and I'm allowed to consider a wide range of things[,]" and then ordered the $16,781 of restitution regarding those horses.[12] The Circuit Court then sentenced each defendant to 84 days of imprisonment, suspending all but 60 days for Hilton Silver, and 30 days for Donna Silver.[13]

The Silvers separately petitioned for certiorari from this Court,[14] both of which we granted. *See Silver v. State*, 417 Md. 125, 9 A.3d 1 (2010).

---

11. The Court observed that the animal cruelty statute provided: "As a condition of sentencing, the court may order a defendant convicted of violating this section to participate in and pay for psychological counseling." *See* CL § 10–604(b)(2).

12. In the hearing, the Circuit Court stated that it was "payable to Baltimore County[,]" but the restitution orders signed by the court were payable directly to the caregiver, Days End Horse Farm Rescue, Inc.

13. The Circuit Court recommended work release for both of the defendants and staggered the sentences.

14. This Court has *certiorari* jurisdiction in "any case in which a circuit court has rendered a final judgment on appeal from the District Court[.]" CJP § 12–305; *see also State v. Monroe*, 82 Md.App. 65, 70, 570 A.2d 338, 340 (1990) (review by *certiorari* is the "sole additional avenue of review" in such a case).

## DISCUSSION

### I. Restitution Orders

██ Both Donna and Hilton Silver argue that the trial court exceeded its authority when it ordered them, as a condition of probation,[15] to pay restitution for the care of animals with regard to whom animal cruelty charges were not pursued by the State.

 We review the trial court's restitution order for abuse of discretion. *See Goff v. State,* 387 Md. 327, 350, 875 A.2d 132, 146 (2005); *In re Delric H.,* 150 Md.App. 234, 240, 819 A.2d 1117, 1121 (2003). Although, generally, a trial court has broad power to order conditions of probation, its discretion has limits, and we have previously invalidated certain restitution orders. *See Pete v. State,* 384 Md. 47, 862 A.2d 419 (2004) (restitution order regarding damaged police cruiser was inappropriate for conviction of second degree assault because the damage was not a "direct result" of the assault);[16] *Chaney v. State,* 397 Md. 460, 473, 918 A.2d 506, 513 (2007) (restitution order invalid because "[i]t had no evidentiary basis and [defendant] was never given the opportunity, prior to its entry, to contest or defend against it.").

---

**15.** Restitution in criminal cases is permitted, by statute, as part of a sentence. *See* Maryland Code (2001, 2008 Repl.Vol.), § 11–603 of the Criminal Procedure Article ("CP") (restitution allowed for losses occurring "as a direct result of the crime or delinquent act"). Restitution is also available as a condition of probation. *See* CP § 6–221 ("[T]he court may suspend the imposition or execution of sentence and place the defendant on probation on the conditions that the court considers proper."). Here, the record demonstrates that the Circuit Court ordered the restitution as a condition, stating that "the conditions of probation are joint and several[:] [r]estitution to Dr. Klebe in the amount of $275, and to Baltimore County in the amount of $16,718.68."

**16.** Although, technically, separate statutes govern sentencing and probation, restitution orders at either stage must meet the "direct result" requirement of CP Section 11–603. *See Pete v. State,* 384 Md. 47, 862 A.2d 419 (2004). In *Pete,* we "harmoniz[ed]" our interpretation of the two statutes, consistent with our practice of interpreting statutes in "full awareness" of related statutes. *See id.* at 65, 862 A.2d at 429.

Relevant here, we have previously addressed when it is permissible to order restitution for alleged crimes of which the defendant was not convicted, in *Walczak v. State*, 302 Md. 422, 488 A.2d 949 (1985) and *Lee v. State*, 307 Md. 74, 512 A.2d 372 (1986). Those cases control here.

In *Walczak v. State*, 302 Md. 422, 488 A.2d 949 (1985), we held that a trial court may not order a criminal defendant to pay restitution to a victim of a crime for which he was not convicted. *Id.* at 433, 488 A.2d at 954. There, Walczak was alleged to have robbed two victims at gunpoint, and agreed to plead guilty to one count of robbery with a deadly weapon if the State would nolle pros the remaining charges. At sentencing, the Circuit Court ordered Walczak to pay restitution to both victims as a condition of probation. *Id.* at 424, 488 A.2d at 950. At the time, Walczak did not object, and signed the order of probation which required the restitution payments to both victims. On appeal to this Court, Walczak argued that the restitution order was improper.[17] We reviewed the statutes governing the imposition of restitution, and concluded:

> Clearly ... restitution is punishment for the crime of which the defendant has been convicted. Restitution depends on the existence of that crime, and the statute authorizes the court to order restitution only where that court is otherwise authorized to impose punishment.

*Id.* at 429, 488 A.2d at 952. *Walczak* thus limits the sentencing court's ability to order restitution to other alleged victims.

The general rule in *Walczak* is subject to one narrow exception. In *Walczak*, we observed that some courts allow more expansive restitution orders "in cases in which a defendant has entered a plea agreement for restitution of greater

---

17. Also at issue in *Walczak* was whether the defendant preserved the restitution issue, since he did not challenge it below. *See Walczak v. State*, 302 Md. 422, 425–26, 488 A.2d 949, 950 (1985). We held that "when the trial court has allegedly imposed a sentence not permitted by law, the issue should ordinarily be reviewed on direct appeal even if no objections was made in the trial court." *Id.* at 427, 488 A.2d at 951.

amounts than those involved in the crime for which conviction was had." *Walczak*, 302 Md. at 432 n. 3, 488 A.2d at 954 n. 3. One year after *Walczak*, we considered such a plea agreement in *Lee v. State*, where the question presented was "whether, in light of *Walczak* ..., a defendant in a criminal case may, as part of a plea agreement, lawfully be ordered to pay restitution in an amount greater than that involved in the crime of which he was convicted." 307 Md. 74, 75–76, 512 A.2d 372, 373 (1986).[18] We first observed that allowing restitution as part of plea bargaining served important policy goals, especially in multi-count indictments.

> [P]lea-bargaining in situations involving multi-count indictments would be severely restricted. If a defendant could not consent to make restitution for the actual loss caused by his or her conduct relating to the indictment, and have such be a condition of any probation he or she might receive, then the government would have little reason to dismiss indictment counts in order to limit a defendant's potential period of incarceration. More importantly, however, it would frustrate the rehabilitation goals of the probation system.

*Id.* at 80–81, 512 A.2d at 375 (quoting *United States v. McLaughlin*, 512 F.Supp. 907 (D.Md.1981)). We applied these principles in light of our earlier decision in *Walczak:*

> In the present case ... [t]he guilty plea was in pursuance of a plea agreement, the State agreeing to nol-pros the theft count upon the further understanding with the defendant that he would expressly consent, as a condition of probation, to the payment of full restitution for the theft offense.

---

**18.** In *Lee*, the defendant was charged in a two-count indictment with having forged a check in the amount of $198 and with theft of $3,155. *Lee v. State*, 307 Md. 74, 76, 512 A.2d 372, 373 (1986). The defendant pleaded guilty to the forgery count and, in return, the prosecutor agreed to nolle pros the theft count. At trial, the prosecutor informed the court that as part of a plea agreement, Lee would make a full admission of guilt, and that the prosecution would "reserve the right 'to seek restitution to victims in these cases.' " *Id.* at 76, 512 A.2d at 373. Lee signed an " 'Order of Probation' " in which he agreed to pay restitution of $3,155, the amount of loss charged in the nolle-prossed theft count.

Thus, in addition to the forgery conviction, there was a judicial admission of guilt to the criminal acts underlying the theft loss, together with Lee's consent to make restitution in the full amount—all as part of a plea agreement between the parties.

*Id.* at 81, 512 A.2d at 376. *Walczak* and *Lee* thus instruct that a restitution order regarding alleged crimes for which the defendant was not convicted is valid only if the defendant freely and voluntarily agrees to make restitution to victims of the other, alleged crimes as part of a plea agreement.[19]

Applying the standards of *Walczak* and *Lee* in this case, it is clear that the Circuit Court's order of restitution for the surviving horses was invalid. The restitution order was not part of a plea agreement, and the Silvers never agreed to pay for the rehabilitation of the two surviving horses. This case, therefore, falls under the general rule of *Walczak,* and the court was only permitted to order restitution relating to the crimes of which each of the Silvers was convicted.

The State claims that the restitution order in this case was valid because the "Silvers accept[ed] [ ] responsibility for the damages caused as to all counts[.]" According the State, "the record shows that [the] Silver[s] acknowledged [their] responsibility—pursuant to an *Alford* plea in District Court—for the conduct underlying the other counts giving rise to the harm for which the restitution was ordered[.]" Alternatively, the State argues that by accepting the Circuit Court's imposition of conditions of probation, and in return for a reduced sentence, the Silvers have waived any claim that the restitution was unauthorized. The State has, in effect, asked for an

---

19. An examination of the record in *Lee* shows that the plea recital in that case did not include agreement by Lee to any specific restitution amount. The prosecutor stated that the agreement was that Lee would plead guilty to forgery under the first count in the indictment, and "the State would reserve its right to allocate [sic]—particularly to seek restitution to victims in these cases." Lee's defense counsel then responded that these were the terms. From this, we observe that *Lee* requires an agreement to pay *certain victims,* although the exact sum may not be contained in the plea recital.

expansion of the *Lee* exception to cases where the defendant has acknowledged, at any point in the criminal proceedings, some general responsibility for the underlying, allegedly criminal, conduct, even though that defendant has not agreed to pay restitution.

The foundation of our decision in *Lee*, however, was not the defendant's general admission of guilt, but his specific agreement to pay restitution as part of the plea bargaining process. As such, the State's arguments on this point are addressed and effectively rebutted by *Walczak*. Indeed, the plea agreement to which the Silvers agreed in the District Court is indistinguishable from the plea deal in *Walczak*, where the defendant agreed to plead guilty to one count, and the State agreed to drop the remaining counts. Under the State's argument, Walczak, too, would have "acknowledged [his] responsibility . . . for the conduct underlying the other counts giving rise to the harm for which the restitution was ordered[,]" and "accept[ed] the challenged restitution as a condition of probation in lieu of serving a portion of a sentence of incarceration." Walczak's restitution order, however, was still invalid. So too is the order in this case.[20]

The State further warns that this holding "create[s] the ability for a defendant to 'game the system[,]' " by agreeing to certain probation terms involving restitution as part of a plea bargain, but then avoiding any obligation to pay by invoking the *Walczak* rule. We are not convinced. The problem here is less a result of the Silvers "gaming the system," and more the result of a procedural mistake by the State. The Silvers clearly signaled an intent to contest their guilt in the Circuit Court, as they were entitled to by law, by filing a timely appeal. At that point, the State was completely free to re-file, in the Circuit Court, the charges that had been nolle prossed in the District Court. Had the State re-filed those charges, it

---

**20.** Because we find that the Silvers' plea agreements below would not remove this case from *Walczak*, we do not reach the Silvers' alternative argument that their appeal to Circuit Court foreclosed the State from relying on their plea arrangements in the District Court.

would have preserved the full range of sentencing options, including restitution for those counts, and avoided this procedural quandary. Unfortunately, it did not. Adopting the State's appellate position, in contrast, would *allow the State* to request criminal penalties for criminal charges without proving, beyond a reasonable doubt, that the defendant was guilty of those crimes. We decline to open that door.

As *Walczak* and *Lee* have long since established, the State may request, in plea negotiations, that a criminal defendant agree to pay restitution for related, though uncharged, crimes. If the defendant freely and voluntarily agrees to pay such restitution, it is permissible under *Lee*. Where, as here, the defendant does not agree to pay restitution to the victims of the other alleged crimes, the State must charge and convict the defendant of those crimes before requesting restitution. Finally, if a defendant agrees to a plea deal in District Court, but then exercises his right to a de novo appeal in Circuit Court, the State should take the necessary steps to protect its interests and preserve its sentencing options.

## II. Admission of Carpen's Testimony

In addition to the restitution issues, Hilton Silver raised two evidentiary issues on appeal. First, Hilton Silver objects to the Circuit Court's admission of Officer Carpen's testimony, arguing that the prosecutor failed to provide Carpen's written report prior to trial. The alleged discovery violation was raised during Silver's counsel's cross-examination of Carpen, when Silver's counsel learned that much of Carpen's testimony was contained in a report that the State apparently did not provide to Silver. Silver alleges that the State's failure to turn over the document prejudiced Hilton Silver's "ownership" defense.[21]

---

21. Silver's main defense at trial was that he did not own the horses. The Circuit Court, however, agreed with the State and rejected Mr. Hilton's defense, observing that "[t]he [statute] under which both defendants [were charged states] ['if] a person has charge or custody of an animal, as owner or otherwise[.']][T]he 'otherwise' is far encompassing,

 Maryland Rule 4–263(d)(3) requires the State to provide the "name and . . . the address of each State's witness whom the State's Attorney intends to call to prove the State's case in chief or to rebut alibi testimony, together with all written statements of the person that related to the offense charged[.]" Maryland Rule 4–263(d)(1) further requires the State to produce "[a]ll written and all oral statements of the defendant and any codefendant that relate to the offense charged[.]" When the State fails to provide the necessary documents, the Circuit Court may select one of the following options:

[T]he court may [1] order that party to permit the discovery of the matter not previously disclosed, [2] strike the testimony to which the undisclosed matter relates, [3] grant a reasonable continuance, [4] prohibit the party from introducing in evidence the matter not disclosed, [5] grant a mistrial, or [6] enter any other order appropriate under the circumstances.

Md. Rule 4–263(n). Importantly, the same section provides that "[t]he failure of a party to comply with a discovery obligation . . . **does not automatically disqualify a witness from testifying[,]**" and that **"disqualification is within the discretion of the trial court."** (emphasis added). As the statutory language suggests, we apply an abuse of discretion standard to a Court's decision whether to strike testimony due to a discovery violation. *See, e.g., McLennan v. State*, 418 Md. 335, 352–53, 14 A.3d 639, 649 (2011).

After a close examination of the record, we find no merit in Silver's arguments that the Circuit Court abused its discretion in denying the motion to strike the testimony. Indeed, it is hard to see how this information "surprised" or "prejudiced" his case. Clearly, the Silvers were aware of the State's claim that Calypso, and the other horses, were owned by, or in the custody of, the Silvers. Moreover, Mr. Silver were given time to consider this testimony, an opportunity to cross-examine

---

and I find there's sufficient evidence in this case to indicate that Mr. Silver as well as Mrs. Silver [fall within the statute.]"

the State's witnesses regarding the ownership issues, and the opportunity to call his own witness—his daughter—to testify regarding his relative level of custody over the horses. Even if Silver's counsel was surprised by Carpen's claim that Hilton Silver had vaccinated the horses, this testimony was but one of many indicia of Silver's ownership that the State introduced at trial. It is entirely within the discretion of the Circuit Court to deny a motion to strike a witness's testimony, and that discretion was not abused here. Accordingly, we find no error in the Circuit Court's decision to deny Silver's motion to strike.

■■■ Hilton Silver also argues that, even if denying the motion to strike would otherwise be within the Circuit Court's discretion, the Circuit Court failed to *exercise* that discretion and justify its decision to do so. Silver quotes *Nelson v. State,* 315 Md. 62, 70, 553 A.2d 667, 671 (1989), where we stated: "If the judge has discretion, he must use it and the record must show that he used it." On review, a court must be able to determine that the judge did not merely apply some predetermined position. As the cases cited by Silver demonstrate, a Circuit Court is required to give its due attention to alleged discovery errors and, when appropriate, select an option for remedying that error from those listed in Maryland Rule 4–263(n).

We disagree with Silver, however, and find that the Circuit Court did exercise its discretion in this case. After the discovery issue was raised, the Circuit Court directed the State to provide the material to the defendants, and gave the Silvers time to review the documents in question. The Circuit Court heard both the Silvers' and the State's position on the matter. The Circuit Court then chose to remedy the alleged discovery violation by "order[ing] that party to permit the discovery of the matter not previously disclosed," and by "grant[ing] a reasonable continuance[.]" Here, the court did not apply some predetermined position, but instead saw that the Silvers were provided with the discovery material and given an opportunity to examine it, apparently to the satisfac-

tion of the Silver's counsel. Our precedents do not require a trial court to engage in a prolonged and formal analysis of prejudice whenever a discovery error is alleged. Instead, a court is required to hear the arguments of the parties and determine the correct remedy, as the court did in this case.

### III. Admission of the Evidence Regarding the Surviving Horses

 As a final matter, Hilton Silver argues that there was prejudicial error when the Circuit Court admitted "other crimes" evidence consisting of photographs of the two horses who survived. As Silver notes, Md. Rule 5–404(b) limits the admissibility of evidence of "other crimes," and states: "Evidence of other crimes, wrongs, or acts . . . is not admissible to prove the character of a person in order to show action in conformity therewith." Silver cites *Emory v. State*, 101 Md. App. 585, 601, 604, 647 A.2d 1243, 1251, 1253 (1994), where the Court of Special Appeals stated that "[t]he starting proposition with respect to 'other crimes' evidence is that it should be excluded[,]" and that "[i]n terms of appellate review, this is a legal 'call' as to which the trial judge is either right or wrong. There is no deference extended[.]"

Maryland Rule 5–404(b) is designed to prevent the State from

> bring[ing] in 'out of left field' the fact that on some other occasion the defendant committed a crime. The danger being guarded against is that such past behavior will be offered to show and will be used by a jury to conclude that the defendant has a propensity to commit crime.

*Odum v. State*, 412 Md. 593, 611, 989 A.2d 232, 242 (2010). As we recognized in *Odum*, these concerns do not necessarily apply to all "evidence of what happens at a crime scene[,]" and that such evidence may be admitted even though it might show "some possible crime in addition to the one literally charged[.]" *Id.*[22]

---

**22.** Under this reasoning in *Odum*, we permitted the State to introduce evidence of an entire criminal "transaction," including armed robbery,

Examining the disputed evidence in this case, we find that the concerns of Maryland Rule 5–404(b) are not present. The State did not introduce evidence of the condition of the other horses in order to show the Silvers' propensity to abuse animals, so as to prove they abused Calypso. Nor were the photos evidence of "past crimes." Instead, the photos and testimony regarding the surviving horses are merely "crime scene" evidence. Indeed, the neglect of those two horses was intertwined and part of the same criminal episode. Admission of those photos, therefore, does not "engage the gears of 'other crimes' evidence law[,]" and was appropriate even though it may have "shown some possible crime in addition to the one literally charged." *Odum*, 412 Md. at 611, 989 A.2d at 242. We agree with the State, therefore, that the neglect of the surviving horses was not an "other crime" so as to render that evidence presumptively inadmissible.

In any event, any error was harmless. The overwhelming majority of the evidence admitted at trial concerned Calypso's health.[6] The evidence showed that Calypso had collapsed in the yard, in severe shock and extreme malnourishment, and had spent five days wriggling along the ground, trying to get up, such that she had dug out holes in the ground around her feet and head. We do not see how a fleeting mention of two underweight horses in the yard had any more than a negligible effect on the Circuit Court. We hold that any error was harmless beyond a reasonable doubt.[23]

## CONCLUSION

 A circuit court may not order restitution for crimes of which the defendant has not been convicted, unless the defen-

---

kidnapping, carjacking, and murder, even though only kidnapping was being tried at that time. *Odum v. State*, 412 Md. 593, 614, 989 A.2d 232, 244–45 (2010).

**23.** This conclusion is only fortified by our holding with regard to restitution. In vacating the Circuit Court's restitution order to the rescue farm, we have blunted any practical impact that improper consideration of those photos might have caused.

dant has expressly agreed to pay such restitution as part of a valid plea agreement. Here, the defendants were not convicted of animal cruelty toward the surviving horses, and did not agree to pay restitution for the care of those horses. It was therefore beyond the Circuit Court's authority to order that restitution.

 The Circuit Court's judgment was otherwise valid. Restitution was permitted for the euthanization of the horse with regard to whom the defendants were convicted of animal cruelty. The Circuit Court did not abuse its discretion when it granted the Silvers a short continuance and opportunity to examine belatedly delivered discovery documents, denying their motion to strike. The Circuit Court did not err in admitting photographs of the surviving horses. This evidence was not "other crimes" evidence introduced to show a propensity to commit the crime charged. Even if the court erred in admitting the photographs, that error would have been harmless given the overwhelming evidence regarding Calypso's condition.

**JUDGMENT OF THE CIRCUIT COURT ORDERING PETITIONERS TO PAY RESTITUTION TO DAYS END RESCUE FARM VACATED. JUDGMENT OTHERWISE AFFIRMED. COSTS TO BE SPLIT EQUALLY BETWEEN THE PARTIES.**