COMMONWEALTH of Kentucky, Appellant

v.

Shawn A. MORSEMAN, Appellee.

No. 2011–SC–000167–DG.

Supreme Court of Kentucky.

Sept. 20, 2012.

---

Jack Conway, Attorney General of Kentucky, James Coleman Shackelford, Assistant Attorney General, Frankfort, KY, for appellant.

Paul Joseph Dickman, Dickman Law Office, PSC, Covington, KY, for appellee.

Opinion of the Court by Justice SCOTT.

Appellee, Shawn Morseman, pled guilty to Fraudulent Insurance Acts by Complicity (over $300). Pursuant to a plea agreement, the Webster Circuit Court sentenced Appellee to a five-year probated sentence, and ordered restitution to Amica Mutual Insurance Company in the amount of $48,597.02—the full amount distributed by Amica after Appellee's house burned down. On appeal, the Court of Appeals vacated the order of restitution and remanded to the trial court to make specific findings of the monetary damages suffered as a result of the insurance fraud, without regard to the proceeds distributed as a result of the property damage or alternate housing and living expenses. We accepted discretionary review and now reverse.

## I. BACKGROUND

On or about December 13, 2005, a fire destroyed Appellee's home. Amica, Appellee's insurance company, hired an engineering firm to investigate the fire. In its January 10, 2006 report, the firm opined that there was insufficient evidence to determine the origin of the fire, but that it appeared to be electrical in nature. Despite being unable to determine the fire's origin, the firm's investigators ruled out the possibility of foul play.

On January 9, 2006, Appellee gave a sworn statement to Amica that he had no rental storage unit. Police later discovered this to be untrue as Appellee had rented a unit on December 1, 2006—less than two weeks before the fire. Police then

obtained a warrant, searched the unit, and found personal property which had been listed as destroyed by the fire. At a later hearing, a state police arson investigator testified that he thought arson was the cause of the fire, and that a senior state fire marshal agreed with him.

The grand jury then indicted Appellee for: (1) Second Degree Arson by Complicity, KRS 513.030,[1] "by knowingly and unlawfully starting a fire with the intent to collect or facilitate the collection of Insurance proceeds ..." and (2) Fraudulent Insurance Acts by Complicity (over $300), KRS 304.47–020,[2] "by knowingly and with the intent to defraud or deceive an insurer, present[ing] a written or oral statement with the intent to defraud said insurer...."

On October 11, 2007, Appellee reached a plea agreement with the Commonwealth under which Appellee agreed to plead guilty to the insurance fraud charge and pay restitution to Amica in the amount of $48,597.02. In exchange, the Commonwealth agreed to dismiss the arson charge and to recommend a five-year probated sentence.[3] This agreement was memorialized in the Commonwealth's Offer on a Plea of Guilty and an accompanying Court Order—both of which were signed by Appellee and his attorney. Consistent with the agreement, Appellee pled guilty to the insurance fraud charge, the court dismissed the arson charge, and final sentencing was postponed pending a pre-sentence investigation.

At the sentencing hearing, the trial court sentenced Appellee consistent with the agreed-upon conditions. Up to this point, the restitution amount included in the plea agreement and court order was based only upon an oral representation from Amica. Prior to the sentencing hearing, Amica sent the Commonwealth a written itemization of the figure, which the Commonwealth provided Appellee at the sentencing hearing. Because this was the first time Appellee had seen the itemization, he requested additional time to review it, and the trial court added the following handwritten notation to its Order: "Def[endant] reserves the right to request review of restitution upon review of records." The Commonwealth agreed to a separate hearing on the issue of restitution.

1. KRS 513.030(1)(b) provides: "A person is guilty of arson in the second degree when he starts a fire or causes an explosion with intent to destroy or damage a building ... [o]f his own or of another, to collect or facilitate the collection of insurance proceeds for such loss."

2. KRS 304.47–020(1)(a) provides, in pertinent part: "[A] person ... commits a 'fraudulent insurance act' if he or she engages in any of the following ...:[k]nowingly and with intent to defraud or deceive presents ... with knowledge or belief that it will be presented to an insurer ... any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy ..., knowing that the statement contains any false, incomplete, or misleading information concerning any fact or thing material to a claim...."

KRS 304.47–020(2)(b) provides, in pertinent part: "[W]here the claim, benefit, or money referred to in subsection (1) of this section exceeds an aggregate of three hundred dollars ($300), a person convicted of a violation of subsection (1) of this section shall be guilty of a felony...."

The events giving rise to this indictment occurred prior to the amendments to KRS 304.47–020, effective July 15, 2010, which require a fraudulent insurance claim to exceed $500 before a felony may be charged. All references to KRS 304.47–020 in this opinion are to the version of the statute in effect prior to its July 15, 2010 amendments.

3. The Commonwealth also agreed to dismiss all charges against Appellee's wife, who had been indicted on charges stemming from the same event.

At the subsequent restitution hearing, a claims adjuster for Amica confirmed the amount paid was $48,597.02. This amount was based on three payment types:

| | |
|---|---|
| Pay Type A (dwelling—to Country-wide Mortgage): | $34,108.87 |
| Pay Type C (contents/personal property): | $ 5,638.15 |
| Pay Type D (alternate housing/living expenses): | $ 8,850.00 |
| **Total:** | $48,597.02 |

This was the only testimony given at the restitution hearing.

Appellee later filed a memorandum arguing he should only have to reimburse Amica for the Type C amount: $5,638.15. He argued that under the statutory definition of "restitution," which requires a trial court to order reimbursement for expenses suffered "because of a criminal act," KRS 532.350(1)(a), he could only be ordered to reimburse Amica for damages suffered as a result of the insurance fraud—the only criminal act of which he was found guilty. Because he had maintained his innocence with respect to the arson charge, and because that charge was dismissed, he argued that he could not be ordered to reimburse Amica for proceeds disbursed for damage to the house or for alternate housing and living expenses, as those damages were not suffered as a result of his fraudulent statement.

The Circuit Court disagreed and entered an order stating that "[t]he purpose of the restitution hearing was to determine what the specific amounts represented," rather than to determine whether Appellee should be responsible for the entire agreed-upon amount, or only part of it. Accordingly, the court denied Appellee's

motion and ordered him to reimburse Amica for the entire $48,597.02 amount.

On appeal, a divided panel reversed the trial court's judgment. Citing KRS 532.350 and KRS 533.030, the majority held that the trial court abused its discretion because "the statutes concerning restitution provide no authority to impose restitution in an amount other than in the amount of actual loss incurred from [Appellee's] illegal conduct for which he was convicted." It then remanded to the trial court "to make specific findings on the monetary damages suffered as a result of [Appellee's] complicity to the fraudulent insurance acts." In dissent, Special Judge Lambert indicated that he believed there was sufficient evidence from which the trial court could have concluded that *all* of the sums were fraudulently obtained, and opined that "[t]he fact that he was able to negotiate a favorable outcome of the criminal case should not relieve him of the duty to restore [those] sums." We accepted discretionary review.

Additional facts will be provided where helpful to our analysis.

## II. ANALYSIS

The issue before this Court is whether a trial court can order restitution for damages not incurred as a direct result of the specific criminal act(s) of which a defendant has been convicted. Specifically, in this case we must determine whether the trial court abused its discretion when, as part of a plea agreement, it ordered Appellee to reimburse Amica for insurance proceeds distributed for property damage, alternative housing, and living expenses, which were damages not incurred as a result of Appellee's fraudulent insurance acts[4]—the only crime for which he pled

---

4. We note at the outset that in his dissent, Special Judge Lambert believed that there was sufficient evidence from which the trial

court could have concluded that *all* of the insurance proceeds were obtained fraudulently—that is, that there was sufficient evidence

guilty. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 581 (Ky.2000) (*citing Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999)). Insofar as this case requires us to construe. statutory provisions, we do so *de novo. Bob Hook Chevrolet Isuzu, Inc. v. Commonwealth Transp. Cabinet,* 983 S.W.2d 488, 490–91 (Ky.1998).

There are three statutory provisions relevant to this discussion. First, KRS 533.030 discusses when a trial court is required to order restitution and provides, in pertinent part:

> When imposing a sentence of probation or conditional discharge in a case where a victim of a crime has suffered monetary damage as a result of the crime due to his property having been converted, stolen, or unlawfully obtained, or its value substantially decreased as a result of the crime, or where the victim suffered actual medical expenses, direct out-of-pocket losses, or loss of earning as a direct result of the crime ... the court *shall* order the defendant to make restitution in addition to any other penalty provided for the commission of the offense.

KRS 533.03.0(3) (emphasis added).

Second, KRS 532.350(1)(a) defines "restitution" as "any form of compensation paid by a convicted person to a victim for counseling, medical expenses, lost wages due to injury, or property damage and other expenses suffered by a victim because of a criminal act. . . ."

■ Third, the Fraudulent Insurance Acts statute itself contains a similar provision authorizing a trial court to order restitution. It states:

> In addition to imprisonment, the assessment of a fine, or both, a person convicted of a violation of paragraph (a), (b), or (c) of subsection (2) of this section *may* be ordered to make restitution to any victim who suffered a monetary loss due to any actions by that person which resulted in the adjudication of guilt, and to the [Division of Insurance Fraud Investigation of the Kentucky Office of Insurance] for the cost of any investigation. The amount of restitution shall equal the monetary value of actual loss or twice the amount of gain received as a result of the violation, whichever is greater.

KRS 304.47–020(2)(d) (emphasis added). Because restitution provisions are remedial in nature, they "should be liberally construed in favor of their remedial purpose." *Workforce Dev. Cabinet v. Gaines,* 276 S.W.3d 789, 794 (Ky.2008) (*citing Kentucky Ins. Guar. Ass'n v. Jeffers ex rel. Jeffers,* 13 S.W.3d 606, 611 (Ky.2000)).

We begin by noting that the restitution provisions recited above, strictly construed, would only require a trial court to order restitution for losses incurred from a defendant's illegal conduct for which he was adjudicated guilty. In this case, Appellee was only adjudicated guilty of KRS 304.47–020(1)(a) for knowingly, and with the intent to defraud or deceive, providing Amica with a written or oral statement in support of an insurance claim for his personal property. Thus, strictly construed, the restitution provisions would not permit

---

that, although the charge was dismissed, Appellee actually committed the arson. Assuming Appellee gave a written or oral statement to Amica indicating that he was not responsible for the fire, and given that a grand jury found probable cause to indict Appellee on the arson charge, we believe that Special Judge Lambert's conclusion is justifiable. However, we will confine our analysis to the issue as framed above.

the trial court to order restitution for proceeds distributed for property damage, alternative housing, or living expenses, as those amounts cannot fairly be attributable to Appellee's fraudulent statements concerning the storage unit. Rather, distribution of those amounts is attributable to the fire, of which Appellee was not adjudicated criminally responsible.

We believe, however, that in addition to the rule of statutory construction directing courts to construe remedial statutes liberally, the legislature could not have intended to strip trial courts of their authority to enforce plea agreements reached at arm's length, between sophisticated parties.

■■■ Plea bargaining has been a common and important practice in this country and this Commonwealth for decades. *See Blackledge v. Allison,* 431 U.S. 63, 71, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977); *Weatherford v. Commonwealth,* 703 S.W.2d 882, 883 (Ky.1986). "[T]he guilty plea and the often concomitant plea bargain are important components of this country's criminal justice system. Properly administered, they can benefit all concerned." *Weatherford,* 703 S.W.2d at 883 (citation omitted). Plea agreements are often bargained-for exchanges, and are governed by basic contract law. *Covington v. Commonwealth,* 295 S.W.3d 814, 816 (Ky.2009). ·

> If the offer is made by the prosecution and accepted by the accused, either by entering a plea or by taking action to his detriment in reliance on the offer, then the agreement becomes binding and enforceable. Constitutional as well as contractual rights become involved. This is the thrust of *Cope v. Commonwealth,*

645 S.W.2d 703 (Ky.1983) and similar cases in other jurisdictions. In commercial contract law this is offer and acceptance, making a contract, or an offer and detrimental reliance which creates an estoppel preventing withdrawal of the offer.

*Commonwealth v. Reyes,* 764 S.W.2d 62, 65 (Ky.1989). The requirements generally associated with contracts are "offer and acceptance, full and complete terms, and consideration." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.,* 94 S.W.3d 381, 384 (Ky.App.2002) (citations omitted).

■■■ Here, the plea agreement contains all of the requirements of a valid and enforceable contract: (1) the Commonwealth's offer to dismiss the arson charge and to recommend a five-year probated sentence on the condition, among others, of restitution in the amount of $48,597.02 to Amica; (2) Appellee's acceptance of the offer indicated by his signatures on the Commonwealth's Offer on a Plea of Guilty and the accompanying Court Order, as well as an oral guilty plea; (3) full and complete terms incorporated into the Commonwealth's Offer on a Plea of Guilty and the accompanying Court Order; and (4) consideration in the form of mutual promises—the Commonwealth's agreement to dismiss the arson charge and Appellee's promise to reimburse Amica for $48,597.02.[5] *See RAM Eng'g & Constr., Inc. v. Univ. of Louisville,* 127 S.W.3d 579, 586 (Ky.2003) (" '[T]he courts in general require that before mutual promises will be enforced, each as the consideration of the other, each party must promise to do something which will yield a benefit or advantage to the other, or which will result

---

**5.** We note, however, that "a plea of guilty need not be supported by consideration that would support a contract in order to be valid. Moreover, the fact that the state might have received some benefit from the accused's promise is irrelevant, unless the accused can claim deprivation of liberty in some fundamentally unfair way as a result of conferring the benefit upon the state." 22 C.J.S. *Criminal Law* § 489 (2006) (citations omitted).

in a detriment or disadvantage to himself in exchange for the other promise.'") (*quoting* 7 Williston on Contracts, § 7:6, at 77–79 (4th ed.1992)).

Accordingly, "[e]ach party should receive the benefit of his bargain," *United States v. Wesley*, 13 Fed.Appx. 257, 259 (6th Cir.2001), and "[the contract's] terms must necessarily be interpreted in light of the parties' reasonable expectations and understanding of what the agreement means," 22 C.J.S. *Criminal Law* § 490 (2006) (citations omitted). Thus, the question becomes what the parties' reasonable expectations were, and what they understood the agreement to mean. In this regard, it is clear to us that by including the restitution provision in the plea agreement, the Commonwealth intended Appellee to reimburse Amica for the entire amount it distributed in connection to the fire. It is also apparent to us that Appellee, when he entered into the agreement, understood that he was required to reimburse Amica for the entire amount. Moreover, it is anticipated that the Commonwealth will generally consult with and secure the approval of the victim for any plea bargain it may desire to offer. Thus, the terms of restitution to the victims are generally elements of importance in the victim's decision to approve of or object to the plea.

To begin with, on October 17, 2007, Appellee signed the Commonwealth's Offer on a Plea of Guilty which specifically stated that the Commonwealth would recommend probation, "conditions to include restitution in the amount of $48,597.02." The same day, Appellee signed the Court Order that included the exact same condition, including the $48,597.02 figure. A separate provision of the signed Order provides: ". . . I have been represented by competent counsel, and . . . I understand the nature of this proceeding and all matters contained in this document." In short, Appellee knew precisely how much restitution he was responsible for and knew precisely what the amount in question represented.

That Appellee understood that he would be responsible for all insurance proceeds distributed by Amica—including those for property damage, alternate housing, and living expenses, which were *not* suffered by Amica as a result of the insurance fraud—is reflected by the very fact that he agreed, in principle, to pay $48,597.02.[6] This amount clearly represented payment not only for the claim paid on personal property in storage, but also the claim paid for living expenses and the mortgage. Obviously, Appellee knew that Amica had not distributed anywhere near that amount to him personally, as it distributed $34,108.87 directly to his mortgage lender.

Thus, if Appellee did not believe that he should be responsible for reimbursing Amica for amounts in excess of those distributed directly to him for his personal property, he would not have signed the Commonwealth's Offer or the trial court's Order. We therefore begin with the observation that the parties' reasonable expectations and understanding of the plea agreement, when it was entered into, is that Appellee would reimburse Amica for the entire $48,597.02.

Indeed, Appellee does not contend that he misunderstood what the $48,597.02 represented, but rather that his right to review the amount after the sentencing hearing implicitly preserved his right to object and challenge which portions of that amount he owed. We disagree.

---

6. Giving Appellee the benefit of the doubt, we say "in principle" because his agreement to pay was contingent on Amica verifying that amount in writing.

When this issue was first raised after Appellee entered his guilty plea, his attorney stated: "Your Honor ... the Commonwealth is going to be giving us an accounting of the insurance amount at sentencing. There could be a difference between the amount on the plea agreement; that's just a number." To which the trial judge replied: "Sure." This does not indicate that Appellee was preserving his right to challenge what *types* of insurance proceeds he was to reimburse Amica for, but rather that his agreement to pay $48,597.02 was contingent upon written verification from Amica that the figure was accurate.

The only remaining question is whether KRS 533.030(3), KRS 532.350(1)(a), or KRS 304.47–020(2)(d) render the restitution provision in the plea agreement and sentencing order invalid. We hold that they do not. To hold otherwise would eliminate a common and efficient manner of administering justice. We offer the following scenarios as examples:

(a) The Commonwealth charges a defendant with five misdemeanor counts of theft by deception for issuing bad checks. The defendant agrees to plead guilty on one theft count but to make restitution for all five checks.

(b) A grand jury indicts a general contractor with three felony counts of theft by failure to make required disposition for not paying a subcontractor from funds paid by the property owner. The general contractor pleads guilty to a single count but agrees to reimburse all three victims.

(c) The Commonwealth charges a defendant with breaking and entering and fleeing or evading police. The Commonwealth agrees to dismiss the

breaking and entering charge in exchange for (1) a guilty plea on the fleeing or evading charge, and (2) restitution for the victim's broken door or window.

In each of the scenarios described, strict construction of KRS 532.350(1)(a) would require invalidation of the agreed-upon restitution amount after the fact of the plea. The General Assembly could not have intended such an absurd result. These types of agreements occur every day, and are an efficient manner of disposing of charges while providing equitable relief to victims.

Several of our sister courts have considered this very issue and concluded that plea agreements should be treated as exceptions to restitution statutes that, like KRS 532.350(1)(a), require a causal connection between the criminal act and the ordered restitution. For example, in *Oregon v. Carson,* the Oregon Court of Appeals noted that "[e]ven though the statutory framework generally limits restitution awards to damages resulting from crimes of conviction or other criminal activities to which a defendant has admitted, the parties may alter that framework by agreement or waiver." 238 Or.App. 188, 243 P.3d 73, 75 (2010) (citation omitted).

Similarly, in *North Dakota v. Steinolfson,* the Supreme Court of North Dakota upheld a restitution order even though the statutorily required causal connection between the criminal act and the damages for which the restitution was ordered was absent. 483 N.W.2d 182, 185 (N.D.1992). As in this case, the defendant in *Steinolfson* "agreed as a part of his plea to pay restitution for more than those expenses actually incurred as a direct result of the defendant's criminal action." *Id.* (internal quotation marks omitted).[7] *See also*

---

**7.** We acknowledge a difference between the

case at bar and *Steinolfson* in that the defen-

*Washington v. Griffith,* 164 Wash.2d 960, 195 P.3d 506, 508 (2008) (en banc) ("[R]estitution is allowed only for losses that are causally connected to the crimes charged, unless the defendant expressly agrees to pay restitution for crimes for which she was not convicted.") (citations, internal quotation marks, and internal alterations omitted).

Finally, in Maryland, the general rule is that "a trial court may not order a criminal defendant to pay restitution to a victim of a crime for which he was not convicted." *Silver v. Maryland,* 420 Md. 415, 23 A.3d 867, 874 (2011). This rule is subject to one very narrow exception: "a restitution order regarding alleged crimes for which the defendant was not convicted is valid only if the defendant freely and voluntarily agrees to make restitution to victims of the other, alleged crimes as part of a plea agreement." *Id.* at 875. We agree and adopt this Maryland rule as the law of Kentucky.

Before a plea agreement, a defendant is in a position to evaluate the evidence against him and discuss with counsel the options available to him. Here, a grand jury found probable cause to indict Appellee for arson, he was given an opportunity to cross-examine the investigating officer at a suppression hearing, and he made a reasoned, deliberate choice to enter into the plea agreement with the Commonwealth. In short, he was given " 'a meaningful choice between the probable outcome at trial and the more certain outcome offered by the plea agreement.'" *Commonwealth v. Elza,* 284 S.W.3d 118, 122 (Ky.2009) (*quoting Vaughn v. Commonwealth,* 258 S.W.3d 435, 439 (Ky.App.

2008)). Appellee freely and voluntarily entered into the plea agreement and must be bound by the terms he agreed to, including the restitution provision.

### III. CONCLUSION

In sum, we hold that a trial court is authorized to order restitution for damages not suffered as a direct result of the criminal act(s) for which the defendant has been convicted when, as part of a plea agreement, the defendant freely and voluntarily agrees to the restitution condition. The trial court therefore did not abuse its discretion when it ordered Appellee to reimburse Amica for the entire $48,597.02. Accordingly, we reverse the judgment of the Court of Appeals and reinstate that of the trial court.

All sitting. All concur.

---

dant in *Steinolfson* accepted responsibility for the accident which caused the damages. We find this difference to be insignificant. In both cases, there was no causal connection between part of the ordered restitution and the criminal acts, despite a statute requiring a causal connection. Accepting responsibility for the actions causing the damages has no bearing on the contractual nature of the plea agreement.