*Darryl Edward Freeman v. State of Maryland,* No. 1118, September Term, 2021. Opinion by Alpert, J.

**CRIMINAL LAW – EVIDENCE – LAY AND EXPERT OPINION –** Officer's testimony that, based on his experience in the robbery unit, "lick" was slang for "robbery" was expert opinion under Maryland Rule 5-702 and *Ragland v. State*, 385 Md. 706 (2005), and required that the officer be disclosed prior to trial as an expert.

**CRIMINAL LAW – EVIDENCE – EXPERT QUALIFICATIONS –** Maryland Rule 5-702 requires that a court shall determine: (1) whether the witness is qualified as an expert; (2) the appropriateness of the expert testimony; and, (3) whether there is a sufficient factual basis to support the testimony. This required determination, although ordinarily made express on the record in open court, may be implicit under the circumstances. Trial court in this case implicitly found the witness qualified to render an expert opinion that "lick" was slang for "robbery," the testimony was appropriate subject of expert testimony, and there was a sufficient factual basis for the court's determination based on the officer's experience in law enforcement.

**CRIMINAL LAW – EVIDENCE – HEARSAY – COCONSPIRATOR EXCEPTION –** Under Maryland Rule 5-803(a)(5), statements by coconspirators are admissible when they are made during the course of and in furtherance of the conspiracy. In this case, text messages offering to sell proceeds from a robbery were made in furtherance of the conspiracy and were admissible.

**CRIMINAL LAW – EVIDENCE – OPEN DOOR DOCTRINE –** Cross-examination of the police detective, inquiring why the officer did not follow up on other leads and suspects, opened the door to limited evidence that, based on the officer's discussions with other witnesses, further investigation of those leads was not required. Additionally, the court gave a limiting instruction informing the jury that they were not to consider that evidence for its truth but simply to explain the officer's actions.

**CRIMINAL LAW – EVIDENCE – OTHER BAD ACTS –** Text messages from Appellant to third parties inquiring about buying handguns to commit robberies in the near future were admissible because they were specially relevant to show preparation, motive and intent.

Circuit Court for Charles County
Case No.: C-08-CR-20-000179

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1118

September Term, 2021

_____

DARRYL EDWARD FREEMAN

v.

STATE OF MARYLAND

_____

Beachley,
Ripken,
Alpert, Paul E.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Alpert, J.

_____

Filed: September 27, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

Appellant, Darryl Edward Freeman, was indicted in the Circuit Court for Charles County, Maryland, and charged with first degree murder, use of a firearm in commission of a crime of violence, robbery with a dangerous weapon, possession of a regulated firearm by a minor, conspiracy, wearing and carrying a handgun in a vehicle, and other related lesser offenses. Appellant was tried by a jury, and that jury acquitted him of first degree premeditated murder, but convicted him of first degree felony murder, use of a firearm in the commission of felony murder, first degree assault, use of a firearm in the commission of first degree assault, robbery with a dangerous weapon, use of a firearm in the commission of robbery with a dangerous weapon, theft, possession of a regulated firearm by a minor, wearing, carrying and transporting a handgun in a vehicle, conspiracy to commit robbery, conspiracy to commit armed robbery, conspiracy to commit second degree assault, and conspiracy to commit theft. The court sentenced Appellant to life imprisonment for first degree felony murder, and either merged or imposed lesser concurrent sentences for the remaining offenses. On this timely appeal, Appellant asks us to address the following questions:

1. Is Appellant entitled to relief with respect to his sentence for wearing, carrying, or transporting a handgun; three of his convictions for conspiracy; and two of his convictions for use of a firearm?

2. Did the trial court err or abuse its discretion in permitting a police officer to opine as to the meaning of the word "lick" where the officer was not qualified as an expert?

3. Did the trial court err or abuse its discretion in admitting hearsay evidence?

4. Did the trial court err or abuse its discretion in admitting evidence of collateral misconduct?

For the following reasons, we shall merge some of Appellant's sentences, vacate the extra conspiracy convictions, but otherwise, shall affirm the judgments.

BACKGROUND

At around 7:00 p.m. on February 18, 2020, first responders arrived at 3117 Warehouse Landing Road, Bryans Road, Maryland, and found Bradley Brown lying on the driveway, outside near the garage. As would be later determined, Brown sustained two fatal gunshot wounds, one to the chest and the other to his right thigh, and the manner of his death was determined to be a homicide.[1]

In brief, the police recovered the victim's cellphone at the crime scene and found information therein that led them to suspect Appellant. Through text messages on the victim's and Appellant's cellphones, the police learned that the victim, Brown, was selling illegal THC vape pens through social media.[2] At around the same time, and prior to the

---

[1] In view of the issues presented, we need not include a detailed summary of all the evidence. Instead, this background is to provide context for the issues presented on appeal. *See Holmes v. State*, 236 Md. App. 636, 643, *cert. denied*, 460 Md. 15 (2018); *accord Thomas v. State*, 454 Md. 495, 498-99 (2017). And, although sufficiency is not at issue, for purposes of this summation, we shall consider the evidence in the light most favorable to the State as the prevailing party at trial. *See generally State v. Morrison*, 470 Md. 86, 105 (2020).

[2] A "vape pen" is a device used to deliver nicotine, cannabis, or other substances. *See E-Cigarette, or Vaping, Products Visual Dictionary*, U.S. Department of Health and Human Services, https://www.cdc.gov/tobacco/basic_information/e-cigarettes/pdfs /ecigarette-or-vaping-products-visual-dictionary-508.pdf (last visited July 25, 2023). THC, or Tetrahydrocannabinol, is the major psychoactive component of cannabis. *See* National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK563174/ (last visited July 25, 2023).

murder, Appellant was texting his coconspirators and others, and those conversations concerned Appellant's attempts to obtain handguns and to commit a robbery.[3]

On the night of the murder, Appellant was in the company of some of his coconspirators. He was also communicating via Snapchat with the eventual victim, Brown, less than an hour before the murder.[4] It was the State's theory that Appellant and Brown were discussing an anticipated sale of some of the THC vape pens. Through eyewitness testimony, corroborated by surveillance video, neighbors recounted that they saw a vehicle park in Brown's driveway shortly before two gunshots were heard. The evidence at the scene included a loaded, but unfired firearm near the victim's feet, and THC vape pens in the open trunk of the victim's car, parked inside the garage. Cellphone location evidence and DNA evidence from a hairbrush found nearby on the ground placed Appellant at the scene.

Later that same evening, Appellant's alleged coconspirators were in possession of THC vape pens, and the State's theory was that these were the same ones stolen during the robbery and murder. As indicated, Appellant was convicted by a jury of first degree felony murder and related offenses.

We shall include additional details in the following discussion.

---

[3] Police investigators eventually recovered the murder weapon, a KelTec 9 mm handgun, in a subsequent and unrelated incident on April 7, 2020.

[4] "Snapchat is an American multimedia instant messaging app and service developed by Snap Inc., originally Snapchat Inc. One of the principal features of Snapchat is that pictures and messages are usually only available for a short time before they become inaccessible to their recipients." *Snapchat*, Wikipedia, https://en.wikipedia.org/wiki/Snapchat (last accessed July 25, 2023).

DISCUSSION

I.

Appellant first makes various contentions with respect to sentencing. The State concedes some issues, but contests others. We shall discuss these each in turn:

A. Wearing, Carrying or Transporting in a Vehicle

Appellant argues his three year sentence on Count 10 for wearing, carrying, or transporting merges into the twenty year sentence on Count 2 for use of a firearm under the rule of lenity. The State agrees, as do we. *See Wilkins v. State*, 343 Md. 444, 446-47 (1996); *Hunt v. State*, 312 Md. 494, 510 (1988).

B. Multiple Conspiracy Convictions

Next, Appellant argues the State only proved one criminal conspiracy, and that, although the court merged the sentences for three of these four counts, namely Counts 11, 13, and 14, into his twenty year sentence on Count 12 for conspiracy to commit armed robbery, his convictions on three of those counts should be vacated. The State agrees, and again, so do we. *See Molina v. State*, 244 Md. App. 67, 169-71 (2019); *Savage v. State*, 212 Md. App. 1, 13 (2013).

C. Use of a Firearm Convictions

Finally, on this question, Appellant recognizes that the court merged his sentences on Counts 2, 4, and 6 for use of a firearm in the commission of the three underlying felonies of murder, first degree assault, and robbery (Counts 1, 3, and 5), but asks us to go further and vacate his convictions on two of the three use counts. The State disagrees, responding that the merger at sentencing of these use offenses does not also require that their

4

corresponding convictions be vacated. We agree with the State. *See Lovelace v. State*, 214 Md. App. 512, 543 (2013) ("[M]erger does not affect the underlying conviction." (citing *Moore v. State*, 198 Md. App. 655, 689 (2011)); *see generally Garner v. State*, 442 Md. 226, 241-42 (2015) (holding that in a case involving separate offenses, the unit of prosecution for use of a handgun in the commission of a crime of violence is "the crime of violence, not the victim or criminal transaction"). The convictions on Counts 2, 4, and 6 remain unchanged.

## II.

We next consider Appellant's contention that the court erred by permitting Detective Wimberly to testify that the word "lick" and the phrase "sweet licks" meant "robbery," on the grounds that the detective was not qualified as an expert. Specifically, Appellant asserts that "opinion testimony upon technical matters beyond the ken of the average juror requires that the witness be qualified as an expert[,]" and that "[i]t is not at all obvious that the word 'lick,' which in slang parlance may connote a sound beating or defeat . . . means a robbery."[5] Appellant continues, "Under [*Ragland v. State*, 385 Md. 706 (2005)] and its progeny, an individual providing such testimony must be disclosed and qualified as an expert."

In response, the State does not claim that Detective Wimberly was qualified as an expert. Instead, the State argues that the detective's opinion that "lick" means "robbery,"

---

[5] Defense Counsel's theory at trial was that "lick" referred to sex, not robbery. We also note that, in *Mungo v. State*, 258 Md. App. 332, 341, 348 (2023), this Court stated that "lick" meant "commit a robbery." The admissibility of the term was not at issue in that case.

was lay opinion and was admissible under Maryland Rule 5-701. Relying on *In re Ondrel M.*, 173 Md. App. 223 (2007), wherein this Court held that "[n]o specialized knowledge or experience is required in order to be familiar with the smell of marijuana[,]" *id.* at 243, the State asserts "the detective's testimony about the meaning of a slang term he had encountered in his years of working in the robbery unit was permissible lay testimony." We shall provide further background of the pertinent facts and arguments in the trial court.

A. Pertinent Facts: Objections and Arguments

Detective Corey Wimberly, employed with the Charles County Sheriff's Office for fifteen years, nine of which were in the robbery unit, testified that he was involved in this investigation. Pertinent to the issue raised, the detective was asked the following:

> [PROSECUTOR]: Okay. Now, you indicated that you have been in the robbery unit for nine years now?
>
> DETECTIVE WIMBERL[Y]: Correct.
>
> [PROSECUTOR]: In the course of your training and experience in that particular unit, have you come across the term, "lick"?
>
> DETECTIVE WIMBERL[Y]: Yes.
>
> [PROSECUTOR]: Okay, and what is a lick, in your training and experience?
>
> [DEFENSE COUNSEL]: Objection, Your Honor.

During the bench conference, the following ensued:

> [DEFENSE COUNSEL]: Okay. Yeah, so Judge, this is going to be interesting. They are asking him for the definition of what he believes is to be a lick. He was never offered as an expert in the field of slang. And I think for them to say, "Well, in the course of your," whatever, is inappropriate.
>
> They knew that this was the whole basis, the whole State's theory with these text messages, or whatever, on the cell phone. You need an expert if

6

you are going to come in here to indicate that, "Hey, this is what we do, this is what we know."

He could have been offered as an expert. There was no notice given, and he shouldn't be able to testify as to what he thinks it means. And I am going to ask that, I am going [to] object to it.

[TRIAL COURT]: Okay, alright. Mr. [Prosecutor]?

[PROSECUTOR]: And the one thing I would note is, he was designated through the *Ragland* and *Blackwell* notice which indicates he is a law enforcement officer[] with certain specialized training and experience, which obviously would include the specific experience that he has in regards to investigating robberies.

I don't think I need to provide any additional information beyond that in terms of his training and experience.

We are required to provide that specific expert disclosure for officers because they have certain specialized training and experience that the lay individuals do not have.[6]

At that point, Defense Counsel agreed that he had received notice that the officer would be testifying pursuant to the "*Ragland* and *Blackwell* notice" in discovery:

[TRIAL COURT]: Alright, [Defense Counsel], did you get the notice?

[DEFENSE COUNSEL]: I don't know. Does he have a copy of it?

[PROSECUTOR]: Yes, and what page was it, I'm sorry?

[SECOND PROSECUTOR]: It was page 1,715 of the discovery that was sent to him.

---

[6] *See Ragland*, 385 Md. at 725 ("Md. Rules 5-701 and 5-702 prohibit the admission as 'lay opinion' of testimony based upon specialized knowledge, skill, experience, training or education."); *accord State v. Blackwell*, 408 Md. 677, 691 (2009). We also note, the entirely separate issue of the admissibility of the content of the text messages between Appellant and third parties, which included the actual texts mentioning "licks" and "sweet licks," in and of themselves and apart from the present lay/expert issue, was litigated prior to trial and will be discussed *infra*.

[DEFENSE COUNSEL]: Okay, give me a second? Let me double check that, Judge.

[SECOND PROSECUTOR]: No problem.

[DEFENSE COUNSEL]: What was the number again?

[SECOND PROSECUTOR]: 1,715.

[DEFENSE COUNSEL]: Are you saying 1,715?

[SECOND PROSECUTOR]: Yes, 1,715.

[PROSECUTOR]: [Defense Counsel]?

[DEFENSE COUNSEL]: Yes? Oh, there you go. The Court's indulgence? I just want to take a look and see.

[PROSECUTOR]: And, [Defense Counsel], can we have our copy back?

[DEFENSE COUNSEL]: Yeah, of course. Okay.

[PROSECUTOR]: Thank you, sir.[7]

Nevertheless, Defense Counsel continued with his objection:

[DEFENSE COUNSEL]: And I am... I am making my objection based on specifically, I think it requires a specific notice as an expert in the field of criminal slang.

Based on that, that is what my objection is based on. I don't think a *Ragland* [sic] indicates that you have any ability to come in and say what you believe something is being said for.

He doesn't know my client, has no idea, you know, what he means by it. I understand they are saying the general whatever, but I just, I am going to object based on that.

[TRIAL COURT]: Okay, so let me... let me ask another question?

[DEFENSE COUNSEL]: Sure.

---

[7] The "*Ragland* and *Blackwell* notice" is not included in the record.

8

[TRIAL COURT]: Is there such a thing as an expert in slang?

[DEFENSE COUNSEL]: I mean –

[TRIAL COURT]: In other words, I understand experts that come in to help juries with issues that are really beyond the pale of the lay person to understand.

[DEFENSE COUNSEL]: Sure... yeah... sure.

[TRIAL COURT]: So for instance, if we have a medical procedure going on, someone could come testify as to their observations, and they could come testify to what they did.

But like why something happened, or a prognosis going forward, that sort of thing that would require expert testimony, does the rule require you to be an expert to come in, for example, to explain what LOL means in a text message? Or licks, or, you know, WYD, or whatever?

[DEFENSE COUNSEL]: Yeah, I would just indicate to Your Honor, I think there are people who are experts in that field, right? I mean, there's like college professors that teach that type of situation. There's, you know, people, whatever.

But I mean, I am just saying specifically for him to get into it, I think that he would need to be offered as a specific expert in the field of slang terms.

[TRIAL COURT]: Okay. Alright, Mr. [Prosecutor], do you have anything?

[PROSECUTOR]: No, I think we have covered what the basis for why it is that we think he can render the statement, or render his view of what the definition of it is.

We have laid a foundation in regards to his specific training and experience in regards to investigating robberies, and how that comes into the context of robberies.

[TRIAL COURT]: Okay, alright, very good. I am going to overrule the objection. Thank you.

[DEFENSE COUNSEL]: Thank you. Thank you, Your Honor.

After the court's ruling, the following transpired in open court:

9

[PROSECUTOR]: So anyway, Detective Wimberly, over the course of your nine years in the robbery unit, have you had the occasion to come across the term, lick?

DETECTIVE WIMBERL[Y]: Yes, I have.

[PROSECUTOR]: Okay, and what, through your training and experience as a law enforcement officer, again, as a robbery detective, does that term mean?

DETECTIVE WIMBERL[Y]: A robbery.

[PROSECUTOR]: Okay, and what about in the context of sweet, or something like that?

DETECTIVE WIMBERL[Y]: Yeah, and individual, they might refer to it as saying a lick, meaning an individual is an easy rob, easy to rob.

[PROSECUTOR]: Okay.

DETECTIVE WIMBERL[Y]: Yeah.

[PROSECUTOR]: Okay, and this is, I guess, how often have you come across this, generally speaking, in your times investigating robberies?

DETECTIVE WIMBERL[Y]: Numerous times, yeah.[8]

B. <u>Standard of review and general law as to lay vs. expert opinion</u>

We review a court's decision to admit evidence, including lay opinion testimony, under an abuse of discretion standard. *Paige v. State*, 226 Md. App. 93, 124 (2015). We also consider a court's decision to admit expert opinion testimony, including whether a witness is qualified as an expert, under the abuse of discretion standard. *Abruquah v. State*, 483 Md. 637, 652 (2023) (citing, *inter alia*, *Rochkind v. Stevenson*, 471 Md. 1, 10 (2020)).

Maryland Rule 5-701 provides:

---

[8] On cross-examination, Detective Wimberly conceded that he had heard the term "lick" used in other contexts, but that was atypical.

10

If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Maryland Rule 5-702 provides:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

"Md. Rules 5-701 and 5-702 prohibit the admission as 'lay opinion' of testimony based upon specialized knowledge, skill, experience, training or education." *Ragland*, 385 Md. at 725. "The rules of evidence distinguish between the types of opinions and inferences that can be expressed by a lay witness and those for which the witness must be qualified as an expert." *State v. Galicia*, 479 Md. 341, 389, *cert. denied*, 143 S. Ct. 491 (2022). Pursuant to Maryland Rule 5-701, lay witness opinion or inference testimony "is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." "By contrast, 'when the subject of the inference . . . is so particularly related to some science or profession that is beyond the ken of the average lay[person],' it may be introduced only through the testimony of an expert witness properly qualified under Maryland Rule 5-702." *Galicia*, 479 Md. at 389 (quoting *Johnson v. State*, 457 Md. 513, 530 (2018)).

"When a court considers whether testimony is beyond the 'ken' of the average lay[person], the question is not whether the average person is already knowledgeable about a given subject, but whether it is within the range of perception and understanding." *Id.* at 394. "[E]xpert testimony is not required simply because one can explain a matter scientifically." *Johnson*, 457 Md. at 516. "'If a court admits evidence through a lay witness in circumstances where the foundation for such evidence must satisfy the requirements for expert testimony under Maryland Rule 5-702, the court commits legal error and abuses its discretion.'" *Galicia*, 479 Md. at 389 (quoting *Johnson*, 457 Md. at 530).

Our discussion begins with *Ragland, supra*. In that case, two police officers were permitted to testify as lay witnesses, over defense objection, that they believed they observed a drug transaction involving Mr. Ragland and another individual. *Ragland*, 385 Md. at 711-14. There, the State did not notify the defense that the witnesses would testify as experts, nor did it proffer them as experts; neither did the trial court make any finding as to whether the offered testimony would satisfy the requirements of Rule 5-702. *Id*. at 710-11. The jury convicted Mr. Ragland of distribution of a controlled dangerous substance. Mr. Ragland appealed his conviction, arguing that the officers' evidence should only have been admitted as expert testimony, subject to the appropriate qualification and discovery procedures. *Id*. at 709.

During trial, when the prosecutor asked one of the officers on what his opinion was based, he replied, "[b]ased on two temporary assignments in a narcotics unit; two and a half years with this unit; involved in well over 200 drug arrests." *Id*. at 726. The other officer similarly related extensive training and experience in the investigation of drug

12

cases. *Id*. The Court concluded that the officers' testimony could not be considered lay opinion, as the witnesses had devoted considerable time to the study of the drug trade, and they offered their opinions that, among the numerous possible explanations for the events, the correct one was a drug transaction. *Id*.

The connection between the officers' training and experience and their opinions was explicit, and the Court held that "Rules 5-701 and 5-702 prohibit the admission as 'lay opinion' of testimony based upon specialized knowledge, skill, experience, training or education." *Id*. at 725. As the discovery and evidentiary predicates had not been met, and because the Court did not find the error harmless beyond a reasonable doubt, Mr. Ragland's conviction was reversed and the matter remanded for a new trial. *Id*. at 727. *See also Blackwell*, 408 Md. at 691 (holding that testimony about defendant's performance on the horizontal gaze nystagmus test, a roadside sobriety test, by a state trooper who had not been qualified as an expert, constituted expert testimony subject to the strictures of Maryland Rule 5-702); *Coleman-Fuller v. State*, 192 Md. App. 577, 619 (2010) (concluding it was error for police detective to testify to lay opinion that cell phone records placed defendant in vicinity of crime); *Wilder v. State*, 191 Md. App. 319, 364-65 (holding it was error to permit police detective to testify about plotting defendant's location on map using cell phone records without qualifying the witness as an expert), *cert. denied*, 415 Md. 43 (2010).

By contrast, in the case of *In re Ondrel M*., 173 Md. App. 223, the defendant made the same argument advanced here to challenge the trial court's admission as lay opinion of a police officer's testimony that he could smell the odor of marijuana as he approached a

13

vehicle. *Id.* at 238. We held that the officer's testimony was properly admitted as lay opinion because it was based on his personal perception, and no specialized knowledge or experience was required to detect the odor of marijuana. *Id.* at 243-44. The fact that the officer recognized the odor of marijuana because he had been exposed to it during his training and experience as a police officer "[did] not render the opinion, *ipso facto*, an expert opinion." *Id.* at 245. As we explained, "it is not the status of the witness that is determinative[,] [r]ather, it is the nature of the testimony." *Id.* at 244; *see also Warren v. State*, 164 Md. App. 153, 167-69 (2005) (holding that lay opinion testimony given by two police officers regarding whether a defendant was drunk, under the influence of alcohol, and highly impaired by alcohol was admissible because the testimony did not require any specialized knowledge and was based on the officers' perception of the defendant).

C. The slang meaning of "lick" was expert opinion.

Turning back to the case at hand, on appeal, the State argues that Detective Wimberly's testimony that "lick" and "sweet licks" meant "robbery" was lay opinion. Notably, that is *not* the argument the Prosecutor made in the trial court. Arguably conceding the testimony was expert opinion, the Prosecutor maintained that Defense Counsel received adequate notice that the detective was going to testify based on specialized knowledge, training and experience prior to trial via the "*Ragland* and *Blackwell* notice," a notice that is absent from the record. After agreeing that he received the general notice, Appellant clarified that he was not notified that Detective Wimberly

14

would be testifying as an expert in slang. The court overruled this objection and the testimony was elicited in front of the jury.[9]

In considering whether the evidence was lay opinion or required that the witness be qualified as an expert, our independent research reveals that the Urban Dictionary defines "Lick" as "[a] successful type of theft which results in an acceptable, impressive and rewarding payday for the protagonist. [For example,] Last night, hit a good lick. I brought home three figures easy for about two hours worth of my time. Not too bad I don't think." https://www.urbandictionary.com/define.php?term=Lick (last visited July 28, 2023). Another online source indicates that "LICK is a slang word that means 'Sudden Influx of Money,' 'Theft,' 'Easy Target,' 'Side Hussle,' and 'To Beat'". https://www.cyber definitions.com/definitions/LICK.html#:~:text=LICK%20is%20a%20slang%20word,LIC K%2C%20with%20examples%20of%20use (last visited July 28, 2023).

We recognize that words and phrases often have multiple meanings, and "the meanings of even common words may be context-dependent[.]" *Armstead v. State*, 342 Md. 38, 56 (1996) (discussing principles of statutory interpretation). That is especially true with respect to code words used by drug dealers, which has led courts to recognize the value of expert testimony in interpreting such "drug jargon[.]" *United States v. Vera*, 770 F.3d 1232, 1241 (9th Cir. 2014) ("Drug jargon is well established as an appropriate subject for expert testimony and investigating officers may testify as drug jargon experts who

---

[9] As will be discussed further, the State never formally offered Detective Wimberly as an expert during trial, and the court never expressly accepted him as an expert, in any field.

interpret the meaning of code words used in recorded calls."); *see also, e.g., United States v. Garrett*, 757 F.3d 560, 569 (7th Cir. 2014) (stating that "where the government was attempting to prove that [recorded conversations] concerned the coordination of a drug deal, deciphering code words commonly used in the drug trade would undoubtedly 'help the trier of fact to understand the evidence or to determine a fact in issue.'" (quoting Fed. R. Evid. 702)); *Vandegrift v. State*, 82 Md. App. 617, 634 (upholding trial court's admission of expert testimony that explained "intercepted communications [that] were vague, fragmented, and interspersed with street slang"), *cert. denied*, 320 Md. 801 (1990); Fern L. Kletter, *Necessity and Admissibility of "Slang," "Lingo," "Jargon," or "Code" Expert Testimony in State Cases*, 35 A.L.R.7th Art. 6 (2018) (collecting cases).[10]

Considering these principles, and regardless of the competing theories of admission by the State at trial and the State on appeal, we are not persuaded that the testimony was simply lay opinion. As argued at trial and on appeal, the term "lick" appears subject to various meanings. The meaning attributed by Detective Wimberly may well have been foreign to members of the jury, and it is reasonable to conclude that this interpretation was based on his specialized knowledge, training and experience. Accordingly, under these

---

[10] Both parties refer us to *Ezenwa v. State*, 82 Md. App. 489 (1990). That case was decided prior to the change to the evidentiary rules and *Ragland*. In addition, although we indicated the officer gave his "expert" opinion that the words "things" and "pencils" were code references for drugs, *id*. at 495, 497, our discussion primarily focused on the qualifications of the Nigerian interpreter. Indeed, we observed that "the expertise of the police officer in narcotics investigations is not challenged." *Id*. at 497. By contrast, Detective Wimberly's qualifications as an expert in slang are central to this issue.

circumstances, we conclude the testimony was not lay opinion, but required that Detective Wimberly be qualified as an expert prior to admission of that opinion.

D. <u>The trial court implicitly accepted the witness as an expert</u>.

That brings us to Appellant's argument – whether the witness was "qualified" by the trial court as an expert in slang. At trial, the Prosecutor argued Appellant was properly notified that Detective Wimberly would testify as an expert, because Defense Counsel was provided the "*Ragland* and *Blackwell* notice." But, as set forth in the pertinent facts, contrary to general practice and custom, there was no offer and acceptance on the record during trial that the detective was an expert in any field. Instead, after Defense Counsel clarified that his objection was that he did not receive "a specific notice as an expert in the field of criminal slang[,]" the court simply overruled the objection.[11]

Maryland Rule 5-702 requires that the court "*shall* determine": (1) whether the witness is qualified as an expert; (2) the appropriateness of the expert testimony; and (3) whether there is a "sufficient factual basis" to support the testimony. (Emphasis added.) "'Shall' generally denotes a mandatory duty or obligation." *State v. Coale*, 250 Md. App. 1, 37 (2021). There is no indication in the rule, nor does it appear in the case law, that this determination has to be express or performed on the record in open court. *See generally Walter v. State*, 239 Md. App. 168, 194-95 (2018) (observing that trial courts are required

---

[11] We further note that, in contrast to other witnesses who were offered and accepted as experts on the record in open court, Detective Wimberly was not designated as an "expert" on the list of State's witnesses prepared by the court clerk on the daily sheet.

17

to make the determinations set forth in the rule and that appellate review considers whether the court abused its discretion).

Our review persuades us that, although the court did not expressly accept Detective Wimberly as a qualified expert, he was deemed so, albeit implicitly. Indeed, although we have not found a case precisely on point, this Court has made clear that a circuit court is not required to "spell out every step in weighing the considerations that culminate in a ruling." *Wisneski v. State*, 169 Md. App. 527, 556 (2006), *aff'd*, 398 Md. 578 (2007). A trial court's findings are sufficient when "the record supports a reasonable conclusion that appropriate factors were taken into account in the exercise of discretion." *Cobrand v. Adventist Healthcare, Inc*., 149 Md. App. 431, 445 (2003); *see also Lamalfa v. Hearn*, 457 Md. 350, 389 (2018) ("The circuit court is presumed to know and properly apply the law."). *Cf. Nalls v. State*, 437 Md. 674, 689 (2014) (clarifying that trial courts do not have to use "magic words" to find that a waiver of the right to jury trial was made "knowingly" and "voluntarily").

Other courts have concluded there was no error in not expressly qualifying an expert on the record. *See, e.g.*, *United States v. Lopez-Medina*, 461 F.3d 724, 743 (6th Cir. 2006) ("Given the agents' obvious qualifications, no abuse of discretion occurred in the district court's failure to qualify the witnesses formally before allowing their expert testimony." (internal citation omitted)); *O'Donnell v. Moose Hill Orchards*, 670 A.2d 1030, 1033 (N.H. 1996) ("The trial court is not required to make an explicit finding regarding a witness's qualifications as an expert."); *State v. Rangel*, 747 N.E.2d 291, 294 (Ohio Ct. App. 2000) ("While it is preferable for the trial court to explicitly find that a witness qualifies as an

expert, because the testimony of Whitaker and Scott related to knowledge beyond the scope of a lay person, we can infer from the record that the trial court considered them to be experts."). Based on our review of the record, it is clear that the trial court thought, by simply overruling Defense Counsel's objection that Detective Wimberly was not disclosed as an expert in slang, it was going to admit the detective's expert opinion as to the meaning of "lick" and "sweet lick." Thus, we conclude that the trial court determined that the detective was an expert in slang and we discern no abuse of discretion in that determination.

E. <u>To the extent preserved, there was a sufficient factual basis for the opinion.</u>

Both Appellant's trial argument and his appellate argument focus on whether the expert was "qualified" as an expert in slang. That being said, the provisions of Rule 5-702 not only mandate that the court determine if the witness is "qualified," *see* Rule 5-702(1), but also, the appropriateness of the expert testimony, Rule 5-702(2), *and* whether there is a sufficient factual basis for that determination. Rule 5-702(3). Although it is arguable that Appellant did not preserve these additional grounds, we shall address them in any event. *See Walter v. State*, 239 Md. App. 168, 195 n.15 (2018) (noting that pretrial argument whether the witness was qualified and whether there was a sufficient factual basis for the expert's opinion are separate grounds, but appellate issue concerning factual basis was preserved by defense counsel's general referral at trial, summarily, to all grounds argued during pretrial hearing); *accord Wise v. State*, 243 Md. App. 257, 276 (2019) (explaining *Walter, supra*), *aff'd*, 471 Md. 431 (2020); *see also Gutierrez v. State*, 423 Md. 476, 488-89 (2011) (although recognizing that appellate courts need not consider more detailed versions of general trial objections, nevertheless, issue of admissibility of gang related

testimony was preserved where counsel objected to all such testimony and was granted a continuing objection at trial).

We have no difficulty concluding, in this case, that the meaning of the word "lick" was an appropriate subject of expert testimony given that it was an important issue in this case. As for whether the detective had a sufficient factual basis for his opinion, our Supreme Court has explained that "[w]hen analyzing whether expert testimony is based on 'a sufficient factual basis,' we consider whether the prospective testimony is comprised of (a) an adequate supply of data, and (b) a reliable methodology." *Santiago v. State*, 458 Md. 140, 154 (2018) (citations omitted); *accord Rochkind*, 454 Md. at 286. As our Supreme Court has provided, "'[t]he facts upon which an expert bases his opinion must permit reasonably accurate conclusions as distinguished from mere conjecture or guess[.]'" *Sippio v. State*, 350 Md. 633, 653 (1998) (quoting *State Dep't of Health v. Walker*, 238 Md. 512, 520 (1965)). The Court observed that "[a] factual basis for expert testimony may arise from a number of sources, such as facts obtained from the expert's first-hand knowledge, facts obtained from the testimony of others, and facts related to an expert through the use of hypothetical questions." *Id.* (citing 6 Lynn McLain, *Maryland Evidence*, § 703.1, at 236-37 (1987)).

Applying these principles to this case, prior to rendering his opinion that "lick" meant "robbery," Detective Wimberly testified that he was employed with the Charles County Sheriff for fifteen years, and had been assigned to the robbery unit for nine years. After other unrelated testimony, the following ensued:

20

[PROSECUTOR]: Okay. Now, you indicated that you have been in the robbery unit for nine years now?

DETECTIVE WIMBERL[Y]: Correct.

[PROSECUTOR]: In the course of your training and experience in that particular unit, have you come across the term, "lick"?

DETECTIVE WIMBERL[Y]: Yes.

[PROSECUTOR]: Okay, and what is a lick, in your training and experience?

[DEFENSE COUNSEL]: Objection, Your Honor.

Thereafter, and after the court overruled the objection, Detective Wimberly testified as follows:

[PROSECUTOR]: So anyway, Detective Wimberly, over the course of your nine years in the robbery unit, have you had the occasion to come across the term, lick?

DETECTIVE WIMBERL[Y]: Yes, I have.

[PROSECUTOR]: Okay, and what, through your training and experience as a law enforcement officer, again, as a robbery detective, does that term mean?

DETECTIVE WIMBERL[Y]: A robbery.

[PROSECUTOR]: Okay, and what about in the context of sweet, or something like that?

DETECTIVE WIMBERL[Y]: Yeah, and individual, they might refer to it as saying a lick, meaning an individual is an easy rob, easy to rob.

[PROSECUTOR]: Okay.

DETECTIVE WIMBERL[Y]: Yeah.

[PROSECUTOR]: Okay, and this is, I guess, how often have you come across this, generally speaking, in your times investigating robberies?

DETECTIVE WIMBERL[Y]: Numerous times, yeah.

Having determined in this opinion that the meaning of "lick" required that the witness be qualified as an expert, and having accepted, *arguendo*, that the trial court implicitly found Detective Wimberly qualified to offer expert opinion, the issue comes down to whether the trial court properly exercised its discretion in determining this was a sufficient factual basis to admit the detective's expert opinion. To that end, as our Supreme Court has observed:

> Expert testimony must also have an adequate factual basis so that it is "more than mere speculation or conjecture." *Exxon Mobil Corp. v. Ford*, 433 Md. 426, 478, *as supplemented on denial of reconsideration*, 433 Md. 493 (2013) (citation omitted). If an expert's conclusions are not supported by an adequate factual basis, his opinion has no probative force. *Beatty v. Trailmaster Prod., Inc*., 330 Md. 726, 741 (1993) (citation omitted). The probative value of an expert's testimony is directly related to the "soundness of [the] reasons given" for his conclusions. *Id*. (citation omitted). An adequate factual basis requires: (1) an adequate supply of data; and (2) a reliable methodology for analyzing the data. [*Roy v. Dackman*, 445 Md. 23, 42-43 (2015)] (citation omitted); *Ford*, 433 Md. at 478 (citation omitted). In addition, if the facts and data that an expert relies on are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," they need not be independently admissible at trial. Md. Rule 5-703(a).

*Levitas v. Christian*, 454 Md. 233, 246 (2017).

Although code words and slang were not at issue in the aforementioned case, the Committee Notes to the 2000 Amendment to Federal Rule 702 discussed code words and the basis for their admission as follows:

> The amendment requires that the testimony must be the product of reliable principles and methods that are reliably applied to the facts of the case. While the terms "principles" and "methods" may convey a certain impression when applied to scientific knowledge, they remain relevant when applied to testimony based on technical or other specialized knowledge. *For example, when a law enforcement agent testifies regarding the use of code words in a drug transaction*, the principle used by the agent is that

participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.

Fed. R. Evid. 702, advisory committee's notes to 2000 amendment (emphasis added); reprinted in 3 Saltzburg, et al., *Federal Rules of Evidence Manual*, § 702.04[2] (12th ed. 2019, 2023 Supp.) (discussing the 2000 Amendment to Rule 702). The Notes continued:

Nothing in this amendment is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training or education – may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.

**If the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, *why* that experience is a sufficient basis for the opinion, and how that experience is *reliably applied* to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."** *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough."). The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable. *See O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir. 1994) (expert testimony based on a completely subjective methodology held properly excluded). *See also Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167, 1176 (1999) ("[I]t will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.").

Fed. R. Evid. 702, advisory committee's notes to 2000 amendment (emphasis added, some citations omitted).

Here, the detective testified that he had nine years' experience in the robbery unit and had heard the term "lick" used on numerous prior occasions. To the extent preserved, and although we recognize that this is a very close case, we conclude from this record that there was a sufficient factual basis for the expert's opinion that "lick" meant "robbery." The testimony was admissible and the trial court properly exercised its discretion.

III.

We next consider Appellant's contention that the trial court erred by admitting hearsay evidence over his objection. The State responds that the court properly exercised its discretion in admitting the evidence. We shall address Appellant's arguments in turn.

A. <u>The messages were admissible under the coconspirator exception.</u>

Appellant first contends that the court erred in admitting the text messages about the THC vape cartridges from Mikayle Qawwee (a.k.a. "Kayle") to another person, made after the victim was killed.[12] Relying on *State v. Rivenbark*, 311 Md. 147 (1987), Appellant's argument is that the statements were not admissible under the coconspirator exception because the conspiracy was over when the participants took the vape cartridges after the murder. The State responds that *Rivenbark* is distinguishable because the conspiracy was ongoing when the participants attempted to sell the proceeds of the robbery and murder.[13]

---

[12] Mikayle Qawwee's name is spelled differently throughout the record. We shall use the spelling as it appears in Appellant's indictment.

[13] Alternatively, the State asserts that these text messages were not hearsay at all, but instead, under *Garner v. State*, 414 Md. 372, 388 (2010), were admissible as verbal acts. Because that ground was not raised in the trial court, and ultimately is unnecessary given our conclusion the messages were admissible under the coconspirator exception, we

(continued…)

Here, when the State sought to admit evidence obtained from the extraction report for Qawwee's iPhone, Appellant argued the contents contained hearsay. The State informed the court the Snapchat messages were from Qawwee to a person identified as "Big Boy Jose," and were "made on February 18th at 9:30 at night, and they relate to basically offering for sale the same vape cartridges that were stolen from Bradley Brown during the homicide. So, there is actually a photograph that was taken and sent as a part of that message." The State argued the texts were admissible as statements by a coconspirator.

Appellant responded the coconspirator exception did not apply because they were made "at least two and a half hours after the incident," and did not relate to the underlying incident. The State replied that the messages were made before the participants had been apprehended and were an attempt to "dispose of the proceeds from the commission of the robbery." Moreover, the State observed that theft was a continuing crime. *See generally Acquah v. State*, 113 Md. App. 29, 53 (1996) (stating, in the context of conspiracy related issues, that "theft is a continuing crime").

The court asked the State to proffer the messages, and the State indicated that one of them was made by the other participant to the conversation, asking Qawwee what the items looked like, and then, Qawwee responded with a photograph of the THC vape cartridges at issue, as well as the apparent price of "17 for 850." After holding the matter

decline to address it. *See generally Appiah v. Hall*, 416 Md. 533, 545 n.4 (2010) (declining to consider an alternative argument not properly presented); *Malaska v. State*, 216 Md. App. 492, 517 n.9 (declining to consider harmless error where no error in admission of evidence), *reconsideration denied* (May 7, 2014), *cert. denied*, 439 Md. 696 (2014), *cert. denied*, 574 U.S. 1122 (2015).

*sub curia*, and after hearing further argument, the trial court ruled the messages, including the photo of the THC vape cartridge, were admissible and that the issue was preserved.[14]

Under the Maryland Rules, hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c). "Except as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible." Md. Rule 5-802. Although review of the admission of evidence by a circuit court is usually considered under the abuse of discretion standard, "'a circuit court has no discretion to admit hearsay in the absence of a provision providing for its admissibility. Whether evidence is hearsay is an issue of law reviewed *de novo*.'" *Gordon v. State*, 431 Md. 527, 536 (2013) (quoting *Bernadyn v. State*, 390 Md. 1, 7-8 (2005)). *Accord Wise v. State*, 471 Md. 431, 442-43 (2020). However, "the factual findings underpinning this legal conclusion necessitate a more deferential standard of review." *Gordon*, 431 Md. at 538.

Among the exceptions to the rule against hearsay is the coconspirator exception. *See* Md. Rule 5-803(a)(5). That rule permits admission of "[a] statement by a coconspirator of the party during the course and in furtherance of the conspiracy." *Id*. Under this exception, "the State must present evidence that the defendant and the declarant were part of a conspiracy, that the statement was made during the course of the conspiracy, and that

---

[14] The State notes that the messages, and specifically the photo of the THC vape cartridge, were relevant because similar cartridges were recovered from both the victim's and Appellant's vehicles.

the statement was made in furtherance of the conspiracy." *Shelton v. State*, 207 Md. App. 363, 376 (2012).

The "furtherance" requirement is interpreted broadly and requires the State to "demonstrate that the declaration or act of the coconspirator was made or done in furtherance of the conspiracy and during its pendency." *Irvin v. State*, 23 Md. App. 457, 472 (1974), *aff'd*, 276 Md. 168 (1975). "Pendency" refers to the "duration of the unlawful agreement[.]" *Id*. at 473. Notably, "pendency," suggests that the conspiracy does not continue "*ad infinitum*[,]" and its duration "is restricted to the accomplishment of its 'main aim[.]'" *Id*. (citing *Krulewitch v. United States*, 336 U.S. 440 (1949)).

"Furtherance" of a conspiracy is shown when "some connection is established between the declaration and the conspiracy[.]" *Id*. at 472 (quotation marks, citation, and emphasis omitted). Statements will be inadmissible, under the exception, "unless it was made before the attainment of the conspiracy's central objective." *Rivenbark*, 311 Md. at 158. Conceivably, "conspirators do not necessarily achieve their chief aim at the precise moment when every element of a substantive offense has occurred." *Id*. Moreover:

> Before the conspirators can be said to have successfully attained their main object, they often must take additional steps, *e.g.*, fleeing, or disposing of the fruits and instrumentalities of [the] crime. Such acts further the conspiracy by assisting the conspirators in realizing the benefits from the offense which they agreed to commit. Therefore, statements made in connection with such acts occur before the conspirators have attained their chief objective and are admissible. On the other hand, it is necessary to distinguish statements made in connection with acts of concealment performed long after the conspirators have realized all benefits from the offense which they had agreed to commit. Such statements occur after the conspirators attained their principal aim and are, therefore, ordinarily inadmissible.

*Id.* (citations omitted).

27

Here, the messages and the photograph of the THC vape cartridge were an offer to sell the proceeds of the theft. There was more than sufficient evidence that the main aim of the conspiracy was to steal these items and sell them in exchange for money. We are persuaded that the messages were in furtherance of and during the pendency of the conspiracy. As such, they were admissible and the court properly exercised its discretion.

B. Appellant opened the door to course of the police investigation evidence.

Next, Appellant argues the court erred when it let Detective Johnson explain, during testimony, that the reason he did not follow up on several possible leads, related to the recovery of the murder weapon, was due to information provided by several non-testifying declarants. The State responds that this evidence was elicited after Defense Counsel opened the door by repeatedly challenging the adequacy of the police investigation. The State continues that this issue is meritless considering the trial court gave a limiting instruction informing the jury only to consider the evidence for this limited purpose.

It was established at trial that the murder weapon, a KelTec 9 mm handgun, was recovered during an unrelated stop in Prince George's County on or around April 7, 2020. During the cross-examination of the lead investigator in this case, Detective Johnson was asked several questions related to the investigation and recovery of that handgun. This included confirmation that that specific handgun, the KelTec, also was used in an unrelated shooting on March 18, 2020 in the District of Columbia and that Detective Johnson did not contact D.C. police to learn the names of the suspects in that other crime. Further, after the detective was told the names of those suspects in that unrelated D.C. shooting, he also

confirmed, again on further cross-examination, that he did not ascertain whether those individuals were present in Charles County when the victim in this case was killed.[15]

Detective Johnson was also asked whether he followed up on the information included in Appellant's text messages, referring to the previously discussed "licks," and "sweet licks," as well as Appellant's queries about purchasing handguns, including whether he contacted the third parties to those conversations. Detective Johnson agreed there was no mention of purchasing a KelTec 9 mm in those conversations, the murder weapon in this case.

During the subsequent redirect examination, the State sought to inquire as to what happened to the KelTec handgun after this murder. Defense Counsel objected and, at a bench conference, the State proffered that police learned through various sources that the murder weapon had been sold. After Defense Counsel made another objection, the State argued in response that the defense was challenging the adequacy of the police investigation itself. Specifically, the State explained during the bench conference that the reason the detective did not seek further information about the unrelated incidents and parties involving the KelTec handgun after the murder was "because at those particular

___

[15] For example, Defense Counsel asked "[D]id you follow up with the detectives, or whoever is investigating it in Prince George's County, to figure out who was involved in that armed carjacking?" Others included: "Did you make any attempts to contact the D.C. police to investigate who had used that KelTec 9-millimeter gun, the same gun that had killed Bradley Brown, from the incident that occurred March 18[th] in D.C.?"; "[D]o you know who Ebony is?"; "[A]s the lead homicide investigator, detective, in this case, you did not contact, or call, or talk to Ebony about any of these text messages, correct?"; "[A]t no point in time did you contact or call this individual to find out more details about what transpired between Mr. Freeman and this person, correct?; "[T]here was no follow up with XD, correct?"

times, Detective Johnson had in his possession all the evidence that supported those individuals were not involved in this incident. And more importantly, that Mr. Freeman, Mr. Belasco, and Mr. Qawwee were."

Defense Counsel agreed that the purpose of the cross-examination was to ask the detective whether "there could be other people involved" or "coordinating[.]" The State responded that Defense Counsel asked a series of questions concerning whether the detective "followed up" with individuals during the investigation and that the implication is "that the detective has failed to do his job and has created and put into place a shoddy investigation." Accordingly, the State continued, Appellant opened the door to permit admission of normally inadmissible information about the course of the police investigation.

Furthermore, acknowledging an objection by Defense Counsel that it was not intending to offer the Appellant's pretrial proffer for its content, the State informed the court that the reason the detective did not investigate further was that on March 10, 2020, Appellant made a proffer that he was present at the crime scene when Brown was murdered, along with Mikayle Qawwee and Keshawn Belasco. For that reason, the State wanted to elicit from the detective simply that the detective had "information so that is why he is not investigating." This would be to counter the anticipated defense argument that, when the KelTec is recovered at a Prince George's County traffic stop on April 7th, the detective did not determine if any of the individuals connected to that stop was the person who murdered the victim. The State then argued:

And he cannot decide to do an entire cross-examination for over an hour where he point, by point, by point, by point, by point, asked if or not you did and you followed up on an investigation, and then say, "Oh, no, the State can't go down that direction." You blew the door off, but the State can't go down that direction with respect to this?

The court agreed with the State that the defense opened the door. The parties then discussed the scope of the specific questions that would be permitted on redirect, in order to avoid admission of the hearsay contents of any conversations between the detective and third parties, including identifying what areas had been opened by cross. The parties and the court also discussed the wording of the court's proposed limiting instruction and that the defense would maintain its objection to the redirect. After this, the jury returned to the courtroom and the court gave the following limiting instruction:

Alright, so ladies and gentlemen, there's going to be a series of questions and answers coming up. For these questions and answers, I want to instruct you that the questions and the answers are not being presented to you for their truth, they are merely to explain the steps the officer took and did not take during the course of the investigation. Go ahead, Mr. [Prosecutor]?

The State asked Detective Johnson whether law enforcement spoke to: Alison Bryant, the mother of Breanna Martin; Martina Freeman Doughton, Appellant's mother; Matthews Carter; and Mikayle Qawwee (referred to herein as "the four individuals"). The detective testified that he was aware of those conversations. The detective was then reminded of the questions on cross-examination, asking whether he followed up on other conversations with Takwon Baker, Kyree Bivens, and Demarco Bethea concerning the April 7, 2020 stop in Prince George's County. He then explained that the reason he did not speak with these latter three individuals nor do any further follow up was because he was

aware of law enforcement discussions with the first four individuals as previously indicated.

Detective Johnson also explained that, because of information received from these four individuals, he did not seek further information related to the text messages between Appellant and the individuals identified in Appellant's cellphone as "NIY Creations," "XD," "Ebony," nor the contact simply listed by a "202" phone number. He further testified that, based on interviews with the four individuals, this was the same reason he did not follow up on information related to a March 18, 2020 shooting in D.C. where the same KelTec handgun was allegedly involved. Finally, the same reasoning applied to information provided by one Destiny Pipkin, meaning, that the reason the detective did not follow up with her was due to the information previously provided by the aforementioned four individuals during their conversations with law enforcement.

Following this, the court again gave a limiting instruction:

> [TRIAL COURT]: Give me one second, Mr. [Prosecutor]? Again, ladies and gentlemen, the question and answers that we just went through were not offered for its truth, they are just offered to explain why the officer did or did not do something throughout the course of the investigation. Satisfactory, [Defense Counsel]?
>
> [DEFENSE COUNSEL]: Yes, Your Honor.
>
> [TRIAL COURT]: State?
>
> [PROSECUTOR]: Yes, that is fine.

Ordinarily, evidence concerning the course of a police investigation is problematic because of the likelihood such evidence is either irrelevant or may include inadmissible hearsay. Our Supreme Court has observed that "[o]n the question of the guilt or innocence

32

of the defendant [such evidence] clearly is hearsay and hence is inadmissible[.]" *Graves v. State*, 334 Md. 30, 39 (1994) (quotation marks and citation omitted). Indeed, the State may not lay out for the jury the detailed course of a criminal investigation unless it has some direct bearing on guilt or innocence. *Zemo v. State*, 101 Md. App. 303, 310-11 (1994); *see also Casey v. State*, 124 Md. App. 331, 348 (1999) (noting that event that occurs in course of investigation does not, *ipso facto*, establish its relevance); *Hall v. State*, 119 Md. App. 377, 383 (1998) (holding testimony regarding course of investigation irrelevant where "none of the testimony concerning the police investigations . . . had any direct bearing on the guilt or innocence of appellant").

Nevertheless, this Court has stated that "statements made by witnesses to police officers, recounted in court by the police to explain the course of the investigation, are frequently not hearsay at all." *Ashford v. State*, 147 Md. App. 1, 76 (citing *Daniel v. State*, 132 Md. App. 576, 589 (2000)), *cert. denied*, 372 Md. 430 (2002). And, police officers may testify concerning the receipt of information that caused them to take certain actions in an investigation. *See*, *e.g.*, *Parker v. State*, 408 Md. 428, 438-39 (2009) (noting that this type of testimony is non-hearsay offered to show action in reliance upon a statement); *Frobouck v. State*, 212 Md. App. 262, 283 (stating that officers' testimony as to why they went to premises leased by the appellant was not hearsay because it was a brief narrative for the jury), *cert. denied*, 434 Md. 313 (2013).

However, the problematic nature of this evidence is offset when, as here, the defense opens the door to its reception. Briefly summarized:

> [A]n opponent may render otherwise irrelevant evidence, including specific instances of conduct, relevant by "opening the door" to it. This can occur when "competent evidence which was previously irrelevant is now relevant through the opponent's admission of other evidence on the same issue." *Clark v. State*, 332 Md. 77, 85 (1993). This doctrine is "based on principles of fairness and serves to balance any unfair prejudice one party may have suffered. . . . [by] introduc[ing] otherwise inadmissible evidence [] in response to evidence put forth by the opposing side." *State v. Robertson*, 463 Md. 342, 351-52 (2019) (cleaned up); *see also id.* at 360 (defense counsel's use of the term "any" expanded the scope of questioning, opening the door for the State "to introduce evidence to rebut the image of [the defendant] as an upstanding individual who had never been in any trouble") (citing Md. Rules 5-404 & 5-608).

*Reyes v. State*, 257 Md. App. 596, 633-34 (2023).

Here, we are persuaded that Appellant's cross-examination of Detective Johnson included numerous instances where the detective was asked why he did not follow up on certain leads and why he did not eliminate other potential suspects, including those that were related to the recovery of the murder weapon. We discern no abuse of discretion in the court's ruling that this opened the door to limited redirect evidence indicating that the reason the detective did not follow those leads was based on conversations with the other four individuals, as indicated, during the course of the police investigation.

Moreover, and as Defense Counsel arguably acquiesced, the court gave clear and concise limiting instructions, before and after the evidence was admitted on redirect, informing the jury that the evidence on redirect was not being admitted for its truth, but simply to explain why Detective Johnson did or did not do certain things during the course of the investigation. Ultimately, we concur with the maxim that "[w]hile a defendant is entitled to a fair trial, he is not entitled to a perfect one; and when curative instructions are given, it is presumed that the jury can and will follow them." *Brooks v. State*, 68 Md. App.

34

604, 613 (1986) (citing *Bruton v. United States*, 391 U.S. 123, 135 (1968)), *cert. denied*, 308 Md. 382 (1987).

IV.

Finally, Appellant also challenges the trial court's rulings admitting evidence of alleged other bad acts, including text messages seeking weapons and opportunities to commit robberies, as well as a photograph, apparently taken from a video, depicting him smoking marijuana. Relying on *Odum v. State*, 412 Md. 593 (2010), the State responds that the text messages were not offered to prove *other* crimes or bad acts, but instead, were evidence related to *this* crime. Alternatively, the State continues, the text messages were specially relevant to prove intent and preparation. The State also responds that the photograph was admitted simply to show that Appellant knew a coconspirator, Mikayle Qawwee.

Prior to trial, Appellant moved *in limine* to exclude cellular evidence seeking weapons and discussing possible robberies or other criminal conduct. The exhibits, admitted at trial over continuing objection and appended to the State's appellate brief herein, contain text messages, shortly before the murder, between: (1) Appellant and an unidentified third party about purchasing a handgun; (2) Appellant and a person identified as "Ebony," about the aforementioned "licks;" (3) Appellant and a phone number identified as "NIY Creations," also about "licks" and Appellant's need for money and suggesting that he might rob a "dice game;" (4) Appellant and a person identified as "xd," about purchasing guns and ammunition.

35

Appellant maintained that these text messages were inadmissible prior bad acts evidence. The State responded during the hearing that the text messages were not other bad acts or crimes, but were evidence of Appellant's future intent, meaning, his plan to obtain a gun and commit a robbery to obtain money. Appellant disagreed, arguing that the text messages did not specifically relate to this case, arguing they were evidence of separate prior bad acts.

The court disagreed that these text messages were evidence of prior bad acts, but instead, were "really the initial planning for this event[.]" Further, the court stated:

> It strikes me that it is being offered to say, what they are really saying is, this gentleman wanted to do an armed robbery, and he is out there looking for a gun so he can do an armed robbery.
>
> Now at the end of the day that might turn out to not be the case. It could just be a coincidence. But the rules, themselves, I don't think we have to get into the clear and convincing evidence that the acts actually took place, because it is being basically conceded here in front of me.
>
> But even if they are bad acts, which I don't . . . which they might be, as you cleverly put it that way, [Defense Counsel], the State can use it show [sic] preparation, and I don't have it here, a plan, common scheme, etcetera. I think it is right there in the rule.

The court continued that the evidence was admissible to show "motive, opportunity, intent" and "preparation" but not a "common scheme or plan." The court further indicated it would consider the issue further if raised during trial, and then stated:

> I can't imagine that if anything changes it is going to be more than a text here or there. But I will let you guys know before the hearing.
>
> And I will tell you, sometimes when you think you've got it is when you should doublecheck yourself. And right now, I think I've got it.

I hear what you are saying. This does not feel . . . because it has been a long day, picking a jury over there, and all this other stuff. So, you know, maybe when my head clears I will see it a different way. But this does not feel like evidence being presented to say that the gentleman is a bad person.

Evidence being presented to say he is a bad person, for example, in a case like this, would be pictures of him posing with guns eight months before this even happened, or him bragging about some robbery that he did at some other point.

This is, to me, close enough in time and proximity to show a search for a weapon that could easily be used in an armed robbery.

Now, maybe . . . maybe he never found a weapon, maybe he did find a weapon. Maybe he found a weapon that was never used in an armed robbery. Maybe he found three weapons, maybe he found no weapons. I don't know, but I am not sure that that is the standard.

The real thing I have for 504.b [sic] is, is this, if it is a prior bad act, is this allowed, is it going to show something other than character? It can show, or it can feel like character, but if it is showing something other than character, I can let it in.

And I will think it through for sure, but it feels, as I sit here right now, that it is showing that a person who is alleged to have committed an armed robbery, a few days, two weeks before the armed robbery, is looking for a gun.

It could be they are looking for a gun to go shoot targets. It could be they are looking for a gun to participate in a robbery. Those things are up to the argument.[16]

"We review a circuit court's decisions to admit or exclude evidence applying an abuse of discretion standard." *Norwood v. State*, 222 Md. App. 620, 642 (citing *Kelly v. State*, 392 Md. 511, 530 (2006)), *cert. denied*, 444 Md. 640 (2015). First, we must consider whether evidence is legally relevant, and, if relevant, we determine whether the evidence

---

[16] The next day, the court reaffirmed its ruling, noting that there was no dispute that it was clear and convincing that the text messages came from Appellant.

is inadmissible because its probative value is outweighed by the danger of unfair prejudice. *State v. Simms*, 420 Md. 705, 725 (2011). Issues of relevance are reviewed *de novo*. *State v. Robertson*, 463 Md. 342, 353 (2019).

Maryland Rule 5-404(b) provides that, "[e]vidence of other crimes, wrongs, or other acts . . . is not admissible to prove the character of a person in order to show action in the conformity therewith." The rule "restricts the admissibility of evidence of 'other crimes, wrongs, or acts,' unless that evidence has special relevance to the case." *Odum*, 412 Md. at 609 (citing *Ayers v. State*, 335 Md. 602, 630-31 (1994), *abrogated on other grounds by State v. Jones*, 466 Md. 142 (2019)). Thus, "evidence of a defendant's prior criminal acts may not be introduced to prove that he is guilty of the offense for which he is on trial." *State v. Faulkner*, 314 Md. 630, 633 (1989) (quotation marks and citation omitted); *see also Terry v. State*, 332 Md. 329, 334 (1993) (stating that other crimes evidence "is excluded because it may tend to confuse the jurors, predispose them to a belief in the defendant's guilt, or prejudice their minds against the defendant"). Evidence of other crimes or bad acts is admissible, however, in limited situations where "the evidence is 'specially relevant' to a contested issue" other than propensity, "'such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.'" *Burris v. State*, 435 Md. 370, 386 (2013) (quoting Rule 5-404(b)).

Our Supreme Court has explained that "the strictures of 'other crimes' evidence law, now embodied in Rule 5-404(b), do not apply to evidence of crimes (or other bad acts or wrongs) that arise during the same transaction and are intrinsic to the charged crime or crimes." *Odum*, 412 Md. at 611. "Intrinsic" evidence is evidence of crimes "so connected

38

or blended in point of time or circumstances with the crime or crimes charged that they form a single transaction, and the crime or crimes charged cannot be fully shown or explained without evidence of the other crimes." *Id*. *See id.* at 611-13 (holding that evidence of crimes leading up to and following the kidnapping for which defendant was on trial, were so "connected or blended in point of time or circumstances" that they "arose out of the same criminal episode" and "formed a single transaction"); *see also Silver v. State*, 420 Md. 415, 436 (2011) (stating that evidence that was "intertwined and part of the same criminal episode" did not "engage the gears of 'other crimes' evidence law" even where it may show "some possible crime in addition to the one literally charged" (quoting *Odum*, 412 Md. at 611) (some quotation marks omitted)). "Acts that are part of the alleged crime itself (such as acts in furtherance of an alleged conspiracy), or put in its immediate context, are not 'other acts' and thus do not have to comply with Md. Rule 5-404(b)." *Odum*, 412 Md. at 611 (quoting Lynn McLain, *Maryland Evidence, State and Federal* § 404.5 (2009 Supp.)) (some quotation marks omitted).

The theory of the case here was that Appellant wanted to obtain a handgun in order to commit a robbery, and that these text messages were evidence of Appellant's future intent as it related to this case. Further, they showed his preparation and his motive and intent to obtain a handgun to commit a robbery. Whether or not they were intrinsic to the crime itself, and we are not certain they were, we are persuaded that they were specially relevant and met the test for the admission of other crimes or bad acts evidence under Rule 5-404(b). The trial court properly exercised its discretion in admitting them as evidence.

Appellant also maintains an objection to a still photograph of him and his coconspirator, Qawwee, sitting on a car, apparently smoking marijuana. The court found that the photograph "shows a relationship" between the two and had probative value. Further, the court found "I just don't see a high level of prejudice to the photograph" and did not show that he was "somehow a bad guy[.]" We agree with the court. The photograph was relevant to prove issues related to the identity of the conspirators, including a material fact in issue of whether Appellant knew Mikayle Qawwee. We also conclude the trial court properly exercised its discretion that any unfair prejudice that may have been suggested by the fact that the photo shows him smoking marijuana, although that is not entirely clear, was substantially outweighed by its probative value. *See generally Montague v. State*, 244 Md. App. 24, 39-40 (2019) (discussing Md. Rule 5-403 and stating that "[e]vidence is unfairly prejudicial 'when it tends to have some adverse effect beyond tending to prove the fact or issue that justified its admission'" (quoting *Hannah v. State*, 420 Md. 339, 347 (2011))), *aff'd*, 471 Md. 657 (2020), *reconsideration denied* (Jan. 29, 2021). The evidence was properly admitted.

**SENTENCE ON COUNT 10 (WEARING, CARRYING, OR TRANSPORTING) MERGED; CONVICTIONS ON COUNTS 11, 13, 14 (CONSPIRACY) VACATED.**

**JUDGMENTS OTHERWISE AFFIRMED.**

**COSTS TO BE PAID ¾ BY APPELLANT, ¼ BY CHARLES COUNTY.**